**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| IN RE: | § § § § § § § | CASE NO. 26-10678 (JOINTLY ADMINISTERED) |
| CROSBY MARINE TRANSPORTATION, LLC, | | CHAPTER 11 COMPLEX CASE |
| DEBTORS.[1] | | |

|  |  |  |
|---|---|---|
| CROSBY TUGS, L.L.C., CROSBY DREDGING, LLC, CROSBY MARINE TRANSPORTATION, LLC, AND BERTUCCI CONTRACTING COMPANY, L.L.C., | § § § § § | ADV. NO. 26-1018 |
| PLAINTIFFS, | § § | |
| V. | § § | |
| MEGED FUNDING GROUP A/K/A MEGED FUNDING GROUP CORP, ALLIANCE ENERGY SERVICES, LLC, ARENA OFFSHORE, CANTRELLE SERVICES LLC, CANTIUM LLC, CAJUN INDUSTRIES LLC, CHAMPAGNE ENERGY & ENVIRONMENTAL SOLUTIONS, CHEVRON PRODUCTION CO., CURTIN MARITIME, ECOSERV, LLC, ECOSERV ENVIRONMENTAL SERVICES, LLC, GAC NORTH AMERICA, INGRAM MARINE GROUP, JOHN W STONE OIL DISTRIBUTOR LLC, KENOSIS OPERATING COMPANY, KEVIN GROS CONSULTING, LOOP LLC, LUHR CROSBY LLC, MODERN AMERICAN RECYCLING, MARSHLAND EQUIPMENT RENTALS, | § § § § § § § § § § § § § § § § § § § § § § § § | |

---

[1]     The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

**MCDONOUGH MARINE SERVICE,** §
**MORRISON OFFSHORE LLC,** §
**PATRIOT MARINE SERVICES,** §
**PORT OF IBERIA DISTRICT BOARD OF** §
**COMMISSIONERS,** §
**ROSE CAY MARITIME LLC,** §
**SABINE NECHES NAVIGATION DISTRICT,** §
**SPACE EXPLORATION TECHNOLOGIES,** §
**TALA ENVIRONMENTAL LLC,** §
**THOM-SEA BOAT BUILDERS,** §
**TK TOWING INC.,** §
**TPC GROUP LLC,** §
**TRITON DIVING SERVICES LLC,** §
**T&T MARINE SALVAGE INC.,** §
**VENTURE GLOBAL CALCASIEU PASS LLC,** §
**WALTER OIL & GAS,** §
**WHITE FLEET DRILLING,** §
**HEEREMA MARINE CONTRACTORS** §
**NEDERLAND, S.E.,** §
**AQUA CAPITAL LLC.,** §
**BREEZE FUNDING,** §
**CELTIC ADVANCE,** §
**EN OD CAPITAL,** §
**ALO ADVANCE,** §
**CEDAR ADVANCE LLC,** §
**CLEARFUND SOLUTIONS, LLC,** §
**COLDWATER CAPITAL, LLC,** §
**COOPER INVESTMENTS, LLC,** §
**DEPENDENCE PLATINUM,** §
**FOREVER FUNDING LLC,** §
**FREEDOM FUNDING LLC,** §
**GALT FUNDING CO,** §
**INSIGHT CAPITAL LLC,** §
**LIBERTAS FUNDING, LLC,** §
**MOBY CAPITAL LLC D/B/A MOBYCAP,** §
**MYNT GOLD, LLC A/K/A MYNT ADVANCE,** §
**NOVAC EQUITIES LLC,** §
**ODK CAPITAL, LLC D/B/A ON DECK,** §
**ORACAP LLC,** §
**OVERTIME CAPITAL,** §
**PARKVIEW ADVANCE LLC,** §
**PINNACLE BUSINESS FUNDING LLC,** §
**RELIANCE FINANCIAL FL, LLC,** §
**ROCKET CAPITAL NY, LLC.** §
**SQ ADVANCE,** §
**SURGE FUNDING LLC,** §
**TRUE BUSINESS FUNDING LLC,** §
**WEB BANK C/O LIBERTAS FUNDING LLC, &** §
**WYNWOOD CAPITAL GROUP, LLC,** §
§

      **DEFENDANTS.**

2

**MEMORANDUM OPINION AND ORDER**

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint"). [ECF Doc. 1]. Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5). *See id*.

Before the Court are *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202], and a cross-motion for summary judgment (the "Cross-MSJ"), [ECF Docs. 207 & 208], filed by MCA Defendant Reliance Financial FL, LLC ("Reliance").[3] The Debtors seek summary judgment against Reliance on Counts 1–4 of their Complaint, and Reliance seeks summary judgment against the Debtors that would dismiss the entire Complaint.

---

[2]　　Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

[3]　　MCA Defendants Meged Funding Group a/k/a Meged Funding Group Corp and Dependance Platinum FL, LLC also joined in the Cross-MSJ. Their cross-motions for summary judgment are addressed in separate opinions.

Both motions are opposed.  [ECF Docs. 274 & 280].  Both parties submitted statements of uncontested material facts, [ECF Docs. 202-1 & 207-10], and counterstatements of material facts, [ECF Docs. 274-1 & 280-1], as well as reply briefs in support of their respective motions, [ECF Docs. 292 & 293].  In short:  The Debtors assert that the text of the MCA Agreement executed between Crosby entities and Reliance is unambiguous and reveals that the agreement is a disguised loan as a matter of law.  [ECF Doc. 292, ¶ 5].  Reliance agrees that the text of the MCA Agreement is unambiguous but asserts that the agreement is a true sale of the Debtors' receivables as a matter of law.  [ECF Docs. 208, at 12; 293, at 4–5].  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ and **DENIES** Reliance's Cross-MSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry.  [ECF Docs. 202-47, ¶ 8 & 202-48].  The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet.  [ECF Doc. 202-47, ¶¶ 23 & 28].  Crosby Tugs assists small freighters, container ships, aircraft carriers, very large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible

rigs, landing platforms, and other vessels.  [ECF Doc. 202-47, ¶ 23].  Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses.  *See id.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable").  [ECF Doc. 202-1, ¶ 9; ECF Doc. 274-1].  Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint.  [ECF Doc. 202-1, ¶ 10; ECF Doc. 274-1].  As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[4] consisting of current accounts receivable in the amount of $5,755,785.29,[5] and past-due accounts receivable in the amount of $5,084,853.16,[6] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[7] consisting of current accounts receivable in the amount of $602,297.63,[8] and past-due accounts receivable in the amount of $7,271,748.74.[9]  [ECF Doc. 202-1, ¶ 11; ECF Doc. 274-1].

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA Defendants executed the following prepetition MCA Agreements:

---

[4]      *See* Complaint, Ex. B, Crosby Tugs, Column G.

[5]      *See* Complaint, Ex. B, Crosby Tugs, Column D.

[6]      *See* Complaint, Ex. B, Crosby Tugs, Column F.

[7]      *See* Complaint, Ex. B, Crosby Dredging, Column G.

[8]      *See* Complaint, Ex. B, Crosby Dredging, Column D.

[9]      *See* Complaint, Ex. B, Crosby Dredging, Column F.

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |
| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |

| | | | | |
|---|---|---|---|---|
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 30 | *Business Loan and Security Agreement* | OnDeck \| ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |
| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |

| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 274-1].   The Debtors and Reliance do not dispute that on December 9, 2025, Kurt J. Crosby, on behalf of "Crosby Tugs LLC," "Crosby Dredging, LLC," and non-debtor affiliate, "Crosby Enterprises, L.L.C.," entered into a "Sale of Future Receipts Agreement" with Reliance (the "Reliance MCA Agreement") and that the copy attached to the Debtors' MPSJ as Exhibit 38 is a true and correct copy of that agreement.[10]  [ECF Doc. 202-39; ECF Doc. 202-1, ¶ 24; ECF Doc. 274-1].  Under the Reliance MCA Agreement, Reliance is identified as "Buyer," the Crosby entities are identified as the "Seller(s)," and the transaction is described as a "purchase" of each Seller's "Future Receipts" in the "Purchased Amount" of $749,500.00 for a "Purchase Price" of $500,000.00.  [ECF Docs. 202-39, at 1 & ¶ 1].

## DISCUSSION

### A.   Summary Judgment Standard

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In

---

[10]    Kurt Crosby also executed the Reliance MCA Agreement in his individual capacity as "Guarantor." [ECF Doc. 202-39, at 11].

so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

"When parties file cross-motions for summary judgment, [courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotations and citation omitted).

**B.      Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g., Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y.

2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. § 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Reliance MCA Agreement is a true sale as it is identified on the face of the agreement, or whether the Court should recharacterize the purported sale as a disguised loan based on the substance of the agreement for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed the Reliance MCA Agreement prepetition. If the Reliance MCA Agreement is a true sale of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Reliance MCA Agreement is a disguised loan, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties agree that their respective interests in certain of the Crosby Accounts Receivable under the Reliance MCA Agreement are governed by Florida law pursuant to the choice-of-law provision in the contract. [ECF Docs. 201 & 208]. Under Florida law, "[t]he intent of the parties to a contract should govern

the construction of a contract." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So.2d 195, 197 (Fla. 1992) (citation omitted). "Where the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document." *Crawford v. Barker*, 64 So.3d 1246, 1255 (Fla. 2011) (citation omitted). "The interpretation of a contract is a question of law . . . ." *Three Keys, Ltd. v. Kennedy Funding, Inc*., 28 So.3d 894, 903 (Fla. Dist. Ct. App. 2009) (citation omitted).

When determining whether a contract evidences a sale or a loan, courts look to substance over form. *See Kay v. Amendola*, 129 So.2d 170, 172 (Fla. Dist. Ct. App. 1961).[11] No published decisions indicate that Florida courts have interpreted merchant cash advance agreements specifically, but bankruptcy courts have recently characterized merchant cash advance agreements containing Florida choice-of-law provisions and relied heavily on New York law. *See In re McKenzie Contracting, LLC*, No. 8:24-BK-01255-RCT, 2024 WL 3508375, at *2–6 (Bankr. M.D. Fla. July 19, 2024) (characterizing MCA agreements governed by Florida law and attached to Proofs of Claim 5-1 and 47-1 for Subchapter V designation purposes); *In re IVF Orlando, Inc.*,

---

[11]     It is true that the plain language of the Reliance MCA Agreement describes the transaction as a "sale":

- The cover page of the agreement lists a "Purchase Price" and states that the "transaction contemplated by this Agreement is a purchase of Future Receipts." [ECF Doc. 202-39, at 1].

- Paragraph 1 of the agreement entitled "Sale of Future Receipts" states: "Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above." [ECF Doc. 202-39, ¶ 1].

- Paragraph 6 of the agreement entitled "Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN)" states: "Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer." [ECF Doc. 202-39, ¶ 6].

But this Court is not bound by the language in the Reliance MCA Agreement labeling the transaction as a sale because the characterization of a transaction as a true sale or a disguised loan turns on the substance of the transaction rather than its form. *See Kay v. Amendola*, 129 So.2d 170, 172 (Fla. Dist. Ct. App. 1961); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

No. 6:24-BK-05475-TPG, 2025 WL 2831400, at *10–14 (Bankr. M.D. Fla. Oct. 3, 2025) (characterizing MCA agreements governed by Florida law for confirmation purposes).

New York courts have identified various non-exclusive hallmarks to evaluate whether a purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id.* (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

(1) Language of the documents and conduct of the parties;

(2) Recourse to the seller;

(3) Seller's retention of servicing and commingling of proceeds;

(4) Purchaser's failure to investigate the credit of the account debtor;

(5) Seller's right to excess collections;

(6) Purchaser's right to alter pricing terms;

(7) Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8) Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts characterizing MCAs have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment

13

under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that a borrower might die or become insolvent, for example, is a risk that every lender takes . . . ."). The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted). Thus, "[t]he deciding factor in the 'sale' versus 'loan' dispute is generally the transfer of risk—if the 'buyer' is absolutely entitled to repayment under all circumstances, then the risk remains with the 'seller' and the transaction is considered a loan." *In re McKenzie Contracting, LLC,* 2024 WL 3508375, at *2 (citations omitted)); *see also In re IVF Orlando, Inc.*, 2025 WL 28331400, at *10 (finding that the transfer-of-risk factor "carries the greatest weight"). "Obviously, the economic substance of the transaction controls this determination." *In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *2.

14

C. **Under Florida Law, the Reliance MCA Agreement Is a Disguised Loan.**

   1. *The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.*

Several provisions in the Reliance MCA Agreement work together effectively to shield Reliance from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Reliance MCA Agreement, Reliance purportedly purchased "Future Receipts," generically identified as "all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business . . . ." [ECF Doc. 202-39, at 1]. Because the Reliance MCA Agreement identifies no particular revenue source, Reliance bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no specific receivables are identified in the Reliance MCA Agreement bears strongly on the question of risk because the Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Reliance is entitled to recover under the Reliance MCA Agreement, so the direct risk of non-collectability remains with the Debtors.

The Reliance MCA Agreement also gives Reliance direct access, control, and authority to sweep funds from the Debtors' bank account:

Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount . . . . For

15

this purpose, **Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer.**

[ECF Doc. 202-39, ¶ 3 (emphasis added)].[12]   The Reliance MCA Agreement also includes a personal guarantee executed by Kurt J. Crosby, "irrevocably, absolutely, and unconditionally guarantee[ing] to Buyer prompt and complete performance" of the Debtors' obligations.   [ECF Doc. 202-39, ¶ 30].   And if a Debtor under the Reliance MCA Agreement "violates or fails to comply with any term or covenant in the agreement,"[13] Reliance can choose from a host of aggressive remedial provisions, including acceleration of the debt:

a. **Buyer may increase the Specified Percentage to 100%** and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. **Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges** (including collection and legal fees as more fully

---

[12]   The Reliance MCA Agreement further provides:

**Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified above** . . . .

In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contract Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s).   To the extent necessary, **Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement**.

[ECF Doc. 202-39, at 14 (emphasis added)].

[13]   Under the Reliance MCA Agreement, the Debtors' responsibilities include:

a. **No Interference**.  Seller must deposit all Future Receipts into an Authorized Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into an Authorized account on a daily basis.  Seller agrees not to (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or, (v) take any other action that denies, or interferes with, Buyer's rights under this agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller.

[ECF Doc. 202-39, ¶ 13].

described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. **Buyer may enforce the provisions of the Guaranty of Performance** against each Guarantor.

d. Seller shall pay to Buyer all reasonable costs associated with Seller's breach. If demanded by Buyer, Seller shall pay Buyer a collection charge in an amount equal to 33% of the undelivered balance of the Purchased Amount . . . .

e. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

f. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of the Seller's banking accounts for all sums due to Buyer.

[ECF Doc. 202-39, ¶ 15 (emphasis added)].

A Debtor under the Reliance MCA Agreement could fail to fund one sweep of its account and find itself subject to immediate acceleration of the full amount of the transaction outstanding. And if Reliance is unable to recover its outstanding balance from the Debtor's bank account, Reliance is entitled to chase full repayment from Kurt Crosby as guarantor of the debt. Read in tandem, the provisions of the Reliance MCA Agreement make it obvious that Reliance bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtor's absolute payment obligation. "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a

17

genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Reliance MCA Agreement weigh in favor of finding the transaction to be a disguised loan. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id*. at 248–50. In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans. As a whole, they provide [Reliance] with at least conditional recourse and expanded legal rights against [the Debtor] entities and the personal guarantors. Plus, they allocate great risk to the [Debtor] counterparty while protecting [Reliance] with much more than just the receivables. [Reliance's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

> 2. *On balance, other hallmarks of the Reliance MCA Agreement weigh in favor of the Court's conclusion that the agreement is a disguised loan.*

At first glance, the Reliance MCA Agreement appears to contain an indefinite term because it requires the Debtors to continue to pay regular, installment amounts until they have fully paid the sum of "receivables" purportedly purchased. A contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But the Reliance MCA Agreement has a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Reliance's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in the Debtor being in breach of the agreement and accelerate the term. And as also

18

made clear above, Reliance assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Reliance MCA Agreement to be a disguised loan.

Finally, Paragraph 4 of the Reliance MCA Agreement entitled "Reconciliation Process (IMPORTANT PROTECTION FOR SELLER)" allows the Debtors to request Reliance to perform a reconciliation or accounting of sweeps taken from the Debtors' accounts with amounts owing under the agreement. [ECF Doc. 202-39, ¶ 4 ("At any time, Seller or Buyer have the right to require a new review of Seller's revenue for the purpose of evaluating whether the Periodic Amount continues to accurately reflect the Specified Percentage of Seller's actual revenue for the period reviewed (a 'reconciliation').")]. Under the agreement, the Debtors may seek reconciliation an unlimited number of times. *See id.* Two outcomes exist after reconciliation:

> If there was an excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day. If there was a shortfall, then Buyer may (but is not required to) increase the Periodic Amount for each subsequent Remittance Day. In either case, Buyer shall adjust the Periodic Amount to an amount equal to the Specified Percentage of Seller's reasonably anticipated average revenue, based on the Reconciliation Information. After an adjustment, the Periodic Amount shall remain unchanged until a subsequent adjustment occurs in accordance with this Section.

*Id.* Regardless of the outcome—as determined by Reliance—the amounts owed by the Debtors under the Reliance MCA Agreement are never reduced due to unforeseen adverse business developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Reliance finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables from the Debtors.[14] For that reason, the Court finds

---

[14] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Reliance MCA Agreement, the failure to fund one sweep results in an irremediable infraction that would foreclose any possibility of future reconciliation. Upon such an event of default, Reliance may employ any or all of its contractual remedies to ensure repayment under the Reliance MCA Agreement is accomplished.

that this particular reconciliation provision weighs in favor of a finding that the Reliance MCA Agreement is not a true sale, but rather a disguised loan.

**CONCLUSION**

The Court thus concludes that the unambiguous terms of the Reliance MCA Agreement substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making the agreement a disguised loan under Florida law. The Court grants judgment as a matter of law in favor of the Debtors on Counts I, III, and IV of the Complaint and denies Reliance's cross-motion for summary judgment.[15] Accordingly,

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Reliance, and **DENIED IN PART** as to Count II of the Complaint as against Reliance.

**IT IS FURTHER ORDERED** that Reliance's Cross-MSJ is **DENIED**.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 17, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

[15] The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Reliance MCA Agreement to be a disguised loan, it need not address the Debtors' alternative argument that, even if the Reliance MCA Agreement is a true sale, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreement only purports to vest Reliance with a capped or fractional interest in those accounts receivable. [ECF Doc. 202, at 44].