**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| DEBTORS.[1] | § | |

| | | |
|---|---|---|
| **CROSBY TUGS, L.L.C., CROSBY DREDGING,** | § | |
| **LLC, CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC, AND BERTUCCI CONTRACTING** | § | |
| **COMPANY, L.L.C.,** | § | **ADV. NO. 26-1018** |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| **MEGED FUNDING GROUP A/K/A MEGED** | § | |
| **FUNDING GROUP CORP,** | § | |
| **ALLIANCE ENERGY SERVICES, LLC,** | § | |
| **ARENA OFFSHORE,** | § | |
| **CANTRELLE SERVICES LLC,** | § | |
| **CANTIUM LLC,** | § | |
| **CAJUN INDUSTRIES LLC,** | § | |
| **CHAMPAGNE ENERGY & ENVIRONMENTAL** | § | |
| **SOLUTIONS,** | § | |
| **CHEVRON PRODUCTION CO.,** | § | |
| **CURTIN MARITIME,** | § | |
| **ECOSERV, LLC,** | § | |
| **ECOSERV ENVIRONMENTAL SERVICES,** | § | |
| **LLC,** | § | |
| **GAC NORTH AMERICA,** | § | |
| **INGRAM MARINE GROUP,** | § | |
| **JOHN W STONE OIL DISTRIBUTOR LLC,** | § | |
| **KENOSIS OPERATING COMPANY,** | § | |
| **KEVIN GROS CONSULTING,** | § | |
| **LOOP LLC,** | § | |
| **LUHR CROSBY LLC,** | § | |
| **MODERN AMERICAN RECYCLING,** | § | |
| **MARSHLAND EQUIPMENT RENTALS,** | § | |

---

[1] The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

|  |  |
|---|---|
| **MCDONOUGH MARINE SERVICE,** | § |
| **MORRISON OFFSHORE LLC,** | § |
| **PATRIOT MARINE SERVICES,** | § |
| **PORT OF IBERIA DISTRICT BOARD OF** | § |
| **COMMISSIONERS,** | § |
| **ROSE CAY MARITIME LLC,** | § |
| **SABINE NECHES NAVIGATION DISTRICT,** | § |
| **SPACE EXPLORATION TECHNOLOGIES,** | § |
| **TALA ENVIRONMENTAL LLC,** | § |
| **THOM-SEA BOAT BUILDERS,** | § |
| **TK TOWING INC.,** | § |
| **TPC GROUP LLC,** | § |
| **TRITON DIVING SERVICES LLC,** | § |
| **T&T MARINE SALVAGE INC.,** | § |
| **VENTURE GLOBAL CALCASIEU PASS LLC,** | § |
| **WALTER OIL & GAS,** | § |
| **WHITE FLEET DRILLING,** | § |
| **HEEREMA MARINE CONTRACTORS** | § |
| **NEDERLAND, S.E.,** | § |
| **AQUA CAPITAL LLC.,** | § |
| **BREEZE FUNDING,** | § |
| **CELTIC ADVANCE,** | § |
| **EN OD CAPITAL,** | § |
| **ALO ADVANCE,** | § |
| **CEDAR ADVANCE LLC,** | § |
| **CLEARFUND SOLUTIONS, LLC,** | § |
| **COLDWATER CAPITAL, LLC,** | § |
| **COOPER INVESTMENTS, LLC,** | § |
| **DEPENDENCE PLATINUM,** | § |
| **FOREVER FUNDING LLC,** | § |
| **FREEDOM FUNDING LLC,** | § |
| **GALT FUNDING CO,** | § |
| **INSIGHT CAPITAL LLC,** | § |
| **LIBERTAS FUNDING, LLC,** | § |
| **MOBY CAPITAL LLC D/B/A MOBYCAP,** | § |
| **MYNT GOLD, LLC A/K/A MYNT ADVANCE,** | § |
| **NOVAC EQUITIES LLC,** | § |
| **ODK CAPITAL, LLC D/B/A ON DECK,** | § |
| **ORACAP LLC,** | § |
| **OVERTIME CAPITAL,** | § |
| **PARKVIEW ADVANCE LLC,** | § |
| **PINNACLE BUSINESS FUNDING LLC,** | § |
| **RELIANCE FINANCIAL FL, LLC,** | § |
| **ROCKET CAPITAL NY, LLC.** | § |
| **SQ ADVANCE,** | § |
| **SURGE FUNDING LLC,** | § |
| **TRUE BUSINESS FUNDING LLC,** | § |
| **WEB BANK C/O LIBERTAS FUNDING LLC, &** | § |
| **WYNWOOD CAPITAL GROUP, LLC,** | § |
|  | § |
| **DEFENDANTS.** | |

2

**MEMORANDUM OPINION AND ORDER**

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint"). [ECF Doc. 1]. Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5). *See id*.

Before the Court is the *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202]. The Debtors seek summary judgment against Freedom Funding LLC ("Freedom") on Counts 1–4 of their Complaint. The Debtors submitted a statement of uncontested facts, [ECF Doc. 202-1], and Freedom filed an opposition to the MPSJ, [ECF Doc. 268], and a counterstatement of material facts, [ECF Doc. 269].[3] The Debtors filed a

---

[2]     Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

[3]     MCA Defendants Aqua Capital LLC, Cooper Investments LLC, Galt Funding Co, Novac Equities, LLC, and Surge Funding LLC joined in Freedom's opposition. The Court has issued a separate *Memorandum Opinion and Order* as to each defendant.

reply brief in support of the MPSJ. [ECF Doc. 292]. In short: The Debtors assert that the text of the two MCA Agreements executed among Crosby entities and Freedom is unambiguous and reveals that the agreements are disguised loans as a matter of law. [ECF Doc. 202 & 292, ¶ 5]. Freedom does not dispute that the text of the MCA Agreements is unambiguous and asserts that the agreements are by their terms true sales. [ECF Doc. 268]. At the same time, however, Freedom also asserts that summary judgment is premature because it has not been given adequate time to conduct discovery to make a complete summary judgment record. *See id.* In their reply, the Debtors repeat the standard contract-interpretation principle that where the language of an agreement is unambiguous, a court must look only at the "four corners" of the agreement (and not to any extrinsic evidence) to interpret the contract as a matter of law, which precludes the need for further discovery here. [ECF Doc. 292, ¶ 6]. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry. [ECF Docs. 202-47, ¶ 8 & 202-48]. The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet. [ECF Doc.

202-47, ¶¶ 23 & 28].  Crosby Tugs assists small freighters, container ships, aircraft carriers, very large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible rigs, landing platforms, and other vessels.  [ECF Doc. 202-47, ¶ 23].  Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses.  *See id.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable").  [ECF Doc. 202-1, ¶ 9; ECF Doc. 274-1].  Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint.  [ECF Doc. 202-1, ¶ 10; ECF Doc. 274-1].  As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[4] consisting of current accounts receivable in the amount of $5,755,785.29,[5] and past-due accounts receivable in the amount of $5,084,853.16,[6] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[7] consisting of current accounts receivable in the amount of $602,297.63,[8] and past-due accounts receivable in the amount of $7,271,748.74.[9]  [ECF Doc. 202-1, ¶ 11; ECF Doc. 274-1].

---

[4]  *See* Complaint, Ex. B, Crosby Tugs, Column G.

[5]  *See* Complaint, Ex. B, Crosby Tugs, Column D.

[6]  *See* Complaint, Ex. B, Crosby Tugs, Column F.

[7]  *See* Complaint, Ex. B, Crosby Dredging, Column G.

[8]  *See* Complaint, Ex. B, Crosby Dredging, Column D.

[9]  *See* Complaint, Ex. B, Crosby Dredging, Column F.

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA

Defendants executed the following prepetition MCA Agreements:

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |

6

| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |
|----|----|----|----|----|
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 30 | *Business Loan and Security Agreement* | OnDeck \| ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |

| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
|---|---|---|---|---|
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |
| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 274-1].   The Debtors and Freedom do not dispute that on December 18, 2025, and February 13, 2026, they entered into the agreements attached as Exhibits 14 and 15 to the Debtors' MPSJ and that those agreements are true and correct copies.  [ECF Docs. 202-15 & 202-16; ECF Doc. 202-1, ¶ 24; ECF Doc. 269].  The basic terms of the agreements are:

- On December 18, 2025, Kurt J. Crosby, on behalf of "Crosby Tugs LLC" and individually as Guarantor, entered into a "Revenue Purchase Agreement" with Freedom for the "purchase" of the Debtor's "Future Receipts" in the amount of $150,000.00, for and "in consideration of a "Purchase Price" of $100,000.00 (the "First Freedom MCA Agreement").  [ECF Doc. 202-15, at 1–2 & 19].

- On February 13, 2026, Kurt J. Crosby, on behalf of "Crosby Tugs LLC" and individually as Guarantor, entered into a "Revenue Purchase Agreement" with Freedom for the "purchase" of the Debtor's "Future Receipts" in the amount of $375,000.00 for and "in consideration of a "Purchase Price" of $250,000.00 (the "Second Freedom MCA Agreement" and, with the First Freedom MCA Agreement, the "Freedom MCA Agreements").  [ECF Doc. 202-16, at 1–2 & 19].

**DISCUSSION**

**A.     Summary Judgment Standard**

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court."  *James by James v. Sadler*,

8

909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").[10]

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the

---

[10] Freedom argues that the Debtors' MPSJ is premature because it needs to conduct discovery on "the actions of the Debtors in connection with confection, execution and prepetition performance under the MCA agreements generally," [ECF Doc. 268, at 5], but Freedom has not pointed to any ambiguous language in the Freedom MCA Agreements that would require the consideration of extrinsic evidence here. Indeed, "[u]nder New York law, when contract language is clear and unambiguous, contracts should be interpreted based on the plain, non-technical meaning of the language of the agreement itself." *Musket Corp. v. Suncor Energy (U.S.A.) Mkt'g, Inc.*, 759 F. App'x 280 290 (5th Cir. 2019) (citing New York cases). "Courts must not consider extrinsic evidence to determine the parties' intentions when contract language is clear." *Id.* (citation omitted). "Where a court can determine the parties' intent from the face of the contract, interpretation is a matter of law and the case is ripe for summary judgment." *Id.* at 291 (internal quotations and citation omitted). The Court finds that the language in the Freedom MCA Agreements is unambiguous; therefore, any extrinsic evidence that Freedom would obtain through discovery would necessarily be immaterial facts with respect to the Debtors' MPSJ, and thus would not defeat the Debtors' MPSJ under Rule 56.

nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

**B.      Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g.*, *Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. § 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Freedom MCA Agreements are true sales as they are identified on the face of the agreements, or whether the Court should recharacterize the purported sales as disguised loans based on the substance of the agreements for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).[11]

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed all of the Freedom MCA

---

[11]      Freedom asserts that the Court does not have the authority to issue a declaration on the Debtors' recharacterization count because New York law does not recognize "affirmative, stand-alone claims for recharacterization." [ECF Doc. 268, at 8 (citing cases dealing with recharacterization in the context of New York's criminal usury statute)].   The Court disagrees.   The Court exercises here its subject-matter jurisdiction to determine property of the estate under § 541 of the Bankruptcy Code which requires it to characterize the Freedom MCA Agreements as either true sales or disguised loans.

Agreements prepetition. If the Freedom MCA Agreements are true sales of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Freedom MCA Agreements are disguised loans, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties do not dispute that their respective interests in certain of the Crosby Accounts Receivable under the Freedom MCA Agreements are governed by New York law pursuant to choice-of-law provisions in the contracts. [ECF Docs. 201 & 269]. New York's general rule of contract interpretation is that "agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (internal quotations and citation omitted). Indeed, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

When determining whether a contract evidences a sale or a loan, New York law requires courts look to substance over form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls." (citation omitted)); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, No. 25-3004, 2025 WL 1934205, at *5 (Bankr. N.D. Ohio July 14, 2025) (under New York law, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether

11

the economic risk of ownership truly transferred to the purported buyer" (citing cases)).[12] Courts applying New York law have identified various non-exclusive hallmarks to evaluate whether a purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id*. (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

---

[12] It is true that the plain language of the Freedom MCA Agreements describes the transactions as "sales":

- Paragraph 1.3 of the agreement entitled "Revenue Purchase Agreement" states: "Seller hereby irrevocably assigns, transfers and conveys onto Purchaser all of Seller's right, title and interest in the Specified Percentage of the Future Receipts . . . . By virtue of this Agreement, Seller transfers to Purchaser full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein." [ECF Doc. 202-15, ¶ 1.3].

- Paragraph 1.17 of the agreement entitled "Revenue Purchase Agreement" states: "Seller and Purchaser agree that the Purchase price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Purchaser to Seller." [ECF Doc. 202-15, ¶ 1.17].

But this Court is not bound by the language in the Freedom MCA Agreements labeling the transactions as sales because under New York law, the characterization of a transaction as a true sale or a disguised loan turns of the substance of the transaction rather than its form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

(1)     Language of the documents and conduct of the parties;

(2)     Recourse to the seller;

(3)     Seller's retention of servicing and commingling of proceeds;

(4)     Purchaser's failure to investigate the credit of the account debtor;

(5)     Seller's right to excess collections;

(6)     Purchaser's right to alter pricing terms;

(7)     Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8)     Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically

occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that a borrower might die or become insolvent, for example, is a risk that every lender takes . . . ."). The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted).

14

      **C.**      **Under New York Law, the Freedom MCA Agreements Are Disguised Loans.**

      *1.*      *The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.*

Several provisions in the Freedom MCA Agreements work together effectively to shield Freedom from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Freedom MCA Agreements, Freedom purportedly purchased "Future Receipts" generically identified as "all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment . . . for the payments to Seller as a result of Seller's sale of goods and/or services." [ECF Doc. 202-15, at 2].[13] Because the Freedom MCA Agreements identify no particular revenue source, Freedom bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no specific receivables are identified in the Freedom MCA Agreements bears strongly on the question of risk because the Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Freedom is entitled to recover under the Freedom MCA Agreements, so the direct risk of non-collectability remains with the Debtors.

Further, although ostensibly a sale of "Future Receipts," Freedom's collateral securing performance is substantially broader than the receivables purchased. The Freedom MCA Agreement provides:

> To secure Seller's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to Purchaser and Purchaser's right to realize the Purchased Amount, as and to the extent required by the terms of the

---

13    Any references herein to the operative terms of the First Freedom MCA Agreement includes identical provisions contained within the Second Freedom MCA Agreement.

Revenue Purchase Agreement, and performance of and compliance by Seller with its other undertakings and agreements herein, Seller and Performance Guarantor(s) grants to Purchaser a security interest in and lien upon: **(a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller and/or Performance Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in Seller's and/or Performance Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions,** and (e) any amount which may be due Purchaser under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets").

[ECF Doc. 202-15, at 20 (emphasis added)].  "The fact that the documents contemplate a broad security package for [Freedom] to generally collateralize payment obligations is indicative of a loan, not a sale." *In re Shoot the Moon, LLC*, 635 B.R. at 815.

The Freedom MCA Agreements also give Freedom rights and recourse against property in addition to its collateral.  Indeed, the Freedom MCA Agreements give Freedom direct access, control, and authority to sweep funds from the Debtors' bank account:

> **Purchaser will debit the Initial Estimated Payment each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, Purchaser (the "Approved Bank Account") into which Seller and Seller's customers shall remit the Receipts from each Transaction, until such time as Purchaser receives payment in full of the Purchased Amount. Seller hereby authorizes Purchaser to ACH debit the agreed Remittance from the Approved Bank Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Seller agrees not to make or cause debits to the Account (other than in favor of Purchaser) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance.** The Approved Bank Account may not be used for any personal, family or household purposes. Seller will provide Purchaser with all required access codes and monthly bank statements regarding the Approved Bank Account so that Purchaser may monitor the Approved Bank Account. Purchaser payment of the Purchase Price, minus applicable fees, shall be deemed the acceptance and performance by Purchaser of this Agreement. Seller understands that it is responsible for ensuring that the agreed Remittance to be debited by Purchaser remains in the Approved Bank Account and will be held responsible for any fees incurred by Purchaser resulting from a rejected ACH attempt or an Event of Default. Purchaser is not responsible for any overdrafts or rejected transactions that may result from Purchaser's ACH debiting the agreed Remittance under the terms

of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Purchaser and Seller, upon the occurrence of an Event of Default of the SELLER AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A (the "Applicable Fees").

[ECF Doc. 202-15, at 2 (emphasis added)].[14]  The Freedom MCA Agreements also include a personal guarantee executed by Kurt J. Crosby, guaranteeing "full, faithful and complete performance and observance of all of Seller's Obligations under the Agreement." [ECF Docs. 202-15, at 22]. And upon the occurrence of an event of default,[15] Freedom can choose from a host

---

[14]     The Freedom MCA Agreements further required the Debtor-borrower to

execute an agreement acceptable to Purchaser with a Bank acceptable to Purchaser to obtain electronic fund transfer services for the Approved Bank Account, and (B) if applicable, execute an agreement acceptable to Purchaser with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Approved Bank Account. **Seller shall provide Purchaser and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Sellar's receivables, receipts, deposits and withdrawals into and from the Approved Bank Account. Seller hereby authorizes Purchaser and/or its agent(s) to withdraw from the Approved Bank Account via ACH debit the amounts owed to Purchaser for the receipts as specified herein and to pay such amounts to Purchaser.** These authorizations apply not only to the Approved Bank Account but also to any subsequent or alternate account used by the Seller for these deposits, whether pre- approved by Purchaser or not. This additional authorization is not a waiver of Purchaser's entitlement to declare this Agreement breached by Seller as a result of its usage of an account which Purchaser did not first pre-approve in writing prior to Sellar's usage thereof. The authorizations shall be irrevocable without the written consent of Purchaser.

[ECF Doc. 202-15, ¶ 1.1 (emphasis added)].

[15]     Under the Freedom MCA Agreements, an "Event of Default" occurs when:

(a) Seller or Performance Guarantor(s) shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Seller or Performance Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c) The sending of notice of termination by Seller or verbally notifying Purchaser of its intent to breach this Agreement;

(d) The Seller fails to give Purchaser 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Sellar's bank, the Seller fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

of aggressive remedial provisions, including but not limited to those found in the section labeled

"Protections against Default" in the Freedom MCA Agreements:

> The following Protections 1 through 8 **may be invoked by Purchaser immediately and without notice to Seller** in the event . . . (g) Seller breaches any terms of this Agreement, including but not limited [sic] any of the Events of Default contained in Section 3.1 herein.
>
> Protection 1. **The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees and costs of collection) become due and payable in full immediately.**
>
> Protection 2**. Purchaser may enforce the provisions of the Limited Personal Guaranty of Performance against the Performance Guarantor(s)**.
>
> Protection 3. **Seller hereby authorizes Purchaser to execute in the name of the Seller a Confession of Judgment in favor of Purchaser** pursuant to the terms of the Confession of Judgment. **Upon an Event of Default, Purchaser may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.**
>
> Protection 4. Purchaser may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.
>
> Protection 5. Purchaser may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9.
>
> Protection 6. Purchaser may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if Purchaser recovers a Judgment against Seller, Seller shall be liable for all of Purchaser's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.
>
> Protection 7. This Agreement shall be deemed Sellar's Assignment of Sellar's Lease of Sellar's business premises to Purchaser. Upon breach of any provision in this Agreement, Purchaser may exercise its rights under this Assignment of Lease without prior Notice to Seller.
>
> Protection 8. **Purchaser may debit Sellar's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-**

---

(e) Seller fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by Purchaser . . . .

[ECF Doc. 202-15, ¶ 3.1].

18

> **generated check drawn on Sellar's bank account or otherwise for all sums due to Purchaser.**
>
> Protection 9. **Purchaser may debit Sellar's depository accounts wherever situated in such amounts as determined by Purchaser in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Seller to Purchaser by means of ACH debit or facsimile signature on a computer-generated check drawn on Sellar's bank account or otherwise for all sums due to Purchaser.**

[ECF Doc. 202-15, ¶ 1.19 (emphasis added)]; *see also* [ECF Doc. 202-15, ¶ 3.3 ("Remedies")].

A Debtor under a Freedom MCA Agreement could fail to fund one sweep of its account—constituting an event of default, *see supra* note 15—and find itself subject to immediate acceleration of the full amount of the transaction outstanding **without notice**. Under the Freedom MCA Agreements, Freedom can act as the Debtors' attorney-in-fact and force the Debtors to obtain new credit to pay amounts accelerated under the contract. [ECF Doc 202-15, ¶ 1.18]. And if Freedom is unable to recover its outstanding balance from the Debtors' bank account, Freedom is entitled to chase full repayment from Kurt Crosby as guarantor of the debt. Read in tandem, the provisions of the Freedom MCA Agreements make it obvious that Freedom bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtors' absolute payment obligation. "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Freedom MCA Agreements weigh in favor of finding the transactions to be disguised loans. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id.* at 248–50. In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans. As a whole, they provide [Freedom] with at least conditional recourse and expanded legal rights

against [the Debtor] entities and the personal guarantors. Plus, they allocate great risk to the [Debtor] counterparty while protecting [Freedom] with much more than just the receivables. [Freedom's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

> 2. *On balance, other hallmarks of the Freedom MCA Agreements weigh in favor of the Court's conclusion that the agreements are disguised loans.*

At first glance, the Freedom MCA Agreements appear to contain an indefinite term because they require the Debtors to continue to pay regular, installment amounts until they have fully paid the sum of "receivables" purportedly purchased. A contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But each Freedom MCA Agreement has a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Freedom's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in an event of default and accelerate the term without notice. And as also made clear above, Freedom assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Freedom MCA Agreements to be disguised loans.

Finally, Paragraph 1.9 of the Freedom MCA Agreements entitled "Reconciliation" allows the Debtors to request Freedom to perform a reconciliation or accounting of sweeps taken from the Debtors' accounts with amounts owing under the agreement. [ECF Doc. 202-15, ¶ 1.9 ("If at any time during the term of this Agreement Seller shall experience unforeseen decreases to their

Daily Receipts, Seller shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.")]. Under the agreements, the Debtors may seek reconciliation an unlimited number of times. *See id*. "Such a modification to their Scheduled Remittance (the "Reconciliation") shall be performed by Purchaser within five (5) Business Days following the written request by Seller for said Reconciliation." *Id.*

Regardless of the outcome—as determined by Freedom—the amounts owed by the Debtors under the Freedom MCA Agreements are never reduced due to unforeseen adverse business developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Freedom finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables from the Debtors.[16] For that reason, the Court finds that this particular reconciliation provision weighs in favor of a finding that the Freedom MCA Agreements are not true sales, but rather disguised loans.

---

[16] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Freedom MCA Agreement, the failure to fund one sweep results in an irremediable infraction that would foreclose any possibility of future reconciliation. Upon such an event of default, Freedom may employ any or all of the "Protections against Default" to ensure repayment under the Freedom MCA Agreements is accomplished.

21

## CONCLUSION

The Court thus concludes that the unambiguous terms of the Freedom MCA Agreements substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making those agreements disguised loans under New York law. The Court grants judgment as a matter of law in favor of the Debtors and against Freedom as to Counts I, III, and IV of the Complaint.[17] Accordingly,

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Freedom, and **DENIED IN PART** as to Count II of the Complaint as against Freedom.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 17, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

[17] The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Freedom MCA Agreements to be disguised loans, it need not address the Debtors' alternative argument that, even if the Freedom MCA Agreements are true sales, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreements only purport to vest Freedom with a capped or fractional interest in those accounts receivable. [ECF Doc. 202, at 44].