**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 26-10678 |
| | § | (JOINTLY ADMINISTERED) |
| CROSBY MARINE TRANSPORTATION, LLC, | § | |
| | § | CHAPTER 11 |
| | § | COMPLEX CASE |
| DEBTORS.[1] | § | |

| | | |
|---|---|---|
| CROSBY TUGS, L.L.C., CROSBY DREDGING, LLC, CROSBY MARINE TRANSPORTATION, LLC, AND BERTUCCI CONTRACTING COMPANY, L.L.C., | § | ADV. NO. 26-1018 |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| MEGED FUNDING GROUP A/K/A MEGED FUNDING GROUP CORP, ALLIANCE ENERGY SERVICES, LLC, ARENA OFFSHORE, CANTRELLE SERVICES LLC, CANTIUM LLC, CAJUN INDUSTRIES LLC, CHAMPAGNE ENERGY & ENVIRONMENTAL SOLUTIONS, CHEVRON PRODUCTION CO., CURTIN MARITIME, ECOSERV, LLC, ECOSERV ENVIRONMENTAL SERVICES, LLC, GAC NORTH AMERICA, INGRAM MARINE GROUP, JOHN W STONE OIL DISTRIBUTOR LLC, KENOSIS OPERATING COMPANY, KEVIN GROS CONSULTING, LOOP LLC, LUHR CROSBY LLC, MODERN AMERICAN RECYCLING, MARSHLAND EQUIPMENT RENTALS, | § | |

---

[1] The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

| | |
|---|---|
| **MCDONOUGH MARINE SERVICE,** | § |
| **MORRISON OFFSHORE LLC,** | § |
| **PATRIOT MARINE SERVICES,** | § |
| **PORT OF IBERIA DISTRICT BOARD OF** | § |
| **COMMISSIONERS,** | § |
| **ROSE CAY MARITIME LLC,** | § |
| **SABINE NECHES NAVIGATION DISTRICT,** | § |
| **SPACE EXPLORATION TECHNOLOGIES,** | § |
| **TALA ENVIRONMENTAL LLC,** | § |
| **THOM-SEA BOAT BUILDERS,** | § |
| **TK TOWING INC.,** | § |
| **TPC GROUP LLC,** | § |
| **TRITON DIVING SERVICES LLC,** | § |
| **T&T MARINE SALVAGE INC.,** | § |
| **VENTURE GLOBAL CALCASIEU PASS LLC,** | § |
| **WALTER OIL & GAS,** | § |
| **WHITE FLEET DRILLING,** | § |
| **HEEREMA MARINE CONTRACTORS** | § |
| **NEDERLAND, S.E.,** | § |
| **AQUA CAPITAL LLC.,** | § |
| **BREEZE FUNDING,** | § |
| **CELTIC ADVANCE,** | § |
| **EN OD CAPITAL,** | § |
| **ALO ADVANCE,** | § |
| **CEDAR ADVANCE LLC,** | § |
| **CLEARFUND SOLUTIONS, LLC,** | § |
| **COLDWATER CAPITAL, LLC,** | § |
| **COOPER INVESTMENTS, LLC,** | § |
| **DEPENDENCE PLATINUM,** | § |
| **FOREVER FUNDING LLC,** | § |
| **FREEDOM FUNDING LLC,** | § |
| **GALT FUNDING CO,** | § |
| **INSIGHT CAPITAL LLC,** | § |
| **LIBERTAS FUNDING, LLC,** | § |
| **MOBY CAPITAL LLC D/B/A MOBYCAP,** | § |
| **MYNT GOLD, LLC A/K/A MYNT ADVANCE,** | § |
| **NOVAC EQUITIES LLC,** | § |
| **ODK CAPITAL, LLC D/B/A ON DECK,** | § |
| **ORACAP LLC,** | § |
| **OVERTIME CAPITAL,** | § |
| **PARKVIEW ADVANCE LLC,** | § |
| **PINNACLE BUSINESS FUNDING LLC,** | § |
| **RELIANCE FINANCIAL FL, LLC,** | § |
| **ROCKET CAPITAL NY, LLC.** | § |
| **SQ ADVANCE,** | § |
| **SURGE FUNDING LLC,** | § |
| **TRUE BUSINESS FUNDING LLC,** | § |
| **WEB BANK C/O LIBERTAS FUNDING LLC, &** | § |
| **WYNWOOD CAPITAL GROUP, LLC,** | § |

    **DEFENDANTS.**

**MEMORANDUM OPINION AND ORDER**

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint"). [ECF Doc. 1]. Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5). *See id*.

Before the Court is the *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202]. The Debtors seek summary judgment against Forever Funding ("Forever") on Counts 1–4 of their Complaint. The Debtors submitted a statement of uncontested facts, [ECF Doc. 202-1], and Forever filed an opposition to the MPSJ, [ECF Doc. 272], and a counterstatement of material facts, [ECF Doc. 272-2].[3] In short: The Debtors assert

---

[2]    Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

[3]    MCA Defendants Wynwood Capital Group, LLC, SQ Advance LLC, Insight Capital LLC, and Cedar Advance LLC joined in Forever's opposition. The Court has issued a separate *Memorandum Opinion and Order* as to each defendant.

that the text of the MCA Agreement executed between Crosby entities and Forever is unambiguous and reveals that the agreement is a disguised loan as a matter of law. [ECF Doc. 292, ¶ 5]. Forever does not dispute that the text of the MCA Agreement is unambiguous and asserts that the agreement is by its terms a true sale. [ECF Doc. 272]. At the same time, however, Forever also asserts that summary judgment is premature because it has not been given adequate time to conduct discovery to make a complete summary judgment record. *See id.* In their reply, the Debtors repeat the standard contract-interpretation principle that where the language of an agreement is unambiguous, a court must look only at the "four corners" of the agreement (and not to any extrinsic evidence) to interpret the contract as a matter of law, which precludes the need for further discovery here. [ECF Doc. 292, ¶ 6]. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry. [ECF Docs. 202-47, ¶ 8 & 202-48]. The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet. [ECF Doc. 202-47, ¶¶ 23 & 28]. Crosby Tugs assists small freighters, container ships, aircraft carriers, very

large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible rigs, landing platforms, and other vessels. [ECF Doc. 202-47, ¶ 23]. Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses. *See id.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable"). [ECF Doc. 202-1, ¶ 9; ECF Doc. 272-2]. Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint. [ECF Doc. 202-1, ¶ 10; ECF Doc. 272-2]. As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[4] consisting of current accounts receivable in the amount of $5,755,785.29,[5] and past-due accounts receivable in the amount of $5,084,853.16,[6] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[7] consisting of current accounts receivable in the amount of $602,297.63,[8] and past-due accounts receivable in the amount of $7,271,748.74.[9] [ECF Doc. 202-1, ¶ 11; ECF Doc. 272-2].

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA Defendants executed the following prepetition MCA Agreements:

---

[4]     *See* Complaint, Ex. B, Crosby Tugs, Column G.

[5]     *See* Complaint, Ex. B, Crosby Tugs, Column D.

[6]     *See* Complaint, Ex. B, Crosby Tugs, Column F.

[7]     *See* Complaint, Ex. B, Crosby Dredging, Column G.

[8]     *See* Complaint, Ex. B, Crosby Dredging, Column D.

[9]     *See* Complaint, Ex. B, Crosby Dredging, Column F.

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |
| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |

| | | | | |
|---|---|---|---|---|
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 30 | *Business Loan and Security Agreement* | OnDeck \| ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |
| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |

| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |
|---|---|---|---|---|

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 272-2]. The Debtors and Forever do not dispute that on June 30, 2025, they entered into the agreement attached as Exhibit 13 to the Debtors' MPSJ and that those agreements are true and correct copies. [ECF Docs. 202-14; ECF Doc. 202-1, ¶ 24; ECF Doc. 272-2]. The basic terms of the agreement are:

> On June 30, 2025, Kurt J. Crosby, on behalf of "Crosby Dredging, LLC" and individually as Guarantor, entered into a "Standard Merchant Cash Advance Agreement" with Forever for the "purchase" of the Debtors' "Receivables" in the amount of $1.65 million for and "in consideration of" a "Purchase Price" of $1.1 million (the "Forever MCA Agreement"). [ECF Doc. 202-14, at 1, ¶ 1, 12 & 16].

**DISCUSSION**

**A.     Summary Judgment Standard**

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169

8

F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").[10]

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

**B. Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g.*, *Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v.*

---

[10] Forever argues that the Debtors' MPSJ is premature because it "no meaningful discovery has occurred," [ECF Doc. 272, at 2], but Forever has not pointed to any ambiguous language in the Forever MCA Agreement that would require the consideration of extrinsic evidence here. Indeed, "[u]nder New York law, when contract language is clear and unambiguous, contracts should be interpreted based on the plain, non-technical meaning of the language of the agreement itself." *Musket Corp. v. Suncor Energy (U.S.A.) Mkt'g, Inc.*, 759 F. App'x 280, 290 (5th Cir. 2019) (citing New York cases). "Courts must not consider extrinsic evidence to determine the parties' intentions when contract language is clear." *Id.* (citation omitted). "Where a court can determine the parties' intent from the face of the contract, interpretation is a matter of law and the case is ripe for summary judgment." *Id.* at 291 (internal quotations and citation omitted). The Court finds that the language in the Forever MCA Agreement is unambiguous; therefore, any extrinsic evidence that Forever would obtain through discovery would necessarily be immaterial facts with respect to the Debtors' MPSJ and thus would not defeat the Debtors' MPSJ under Rule 56.

*Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. § 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Forever MCA Agreement is a true sale as it is identified on the face of the agreement, or whether the Court should recharacterize the purported sale as a disguised loan based on the substance of the agreement for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed the Forever MCA Agreement prepetition. If the Forever MCA Agreement is a true sale of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Forever MCA Agreement is a disguised loan, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties do not dispute that their respective interests in certain of the Crosby Accounts Receivable under the Forever MCA Agreement is governed by New York law pursuant to choice-of-law provisions in the contract. [ECF Docs. 201 & 272]. New York's general rule of contract interpretation is that "agreements are construed in accord with the parties' intent and the best evidence of what parties to a written

agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (internal quotations and citation omitted). Indeed, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

When determining whether a contract evidences a sale or a loan, New York law requires courts look to substance over form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls." (citation omitted)); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, No. 25-3004, 2025 WL 1934205, at *5 (Bankr. N.D. Ohio July 14, 2025) (under New York law, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether the economic risk of ownership truly transferred to the purported buyer" (citing cases)).[11] Courts applying New York law have identified various non-exclusive hallmarks to evaluate whether a

---

[11] It is true that the plain language of the Forever MCA Agreement describes the transaction as a "sale":

- The agreement lists a "Purchase Price" and states: "This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below)." [ECF Doc. 202-14, at 1].

- Paragraph 1 of the agreement entitled "Sale of Future Receipts" states: "Merchant(s) hereby sell, assign, and transfer to FF (making FF the absolute owner) in consideration of the funds provided for ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligation arising from or relating to the payment of monies from each Merchant's customers and/or third party payors . . . ." [ECF Doc. 202-14, ¶ 1].

- Paragraph 15 of the agreement entitled "Sale of Receivables" states: "Each Merchant and FF agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FF to any Merchant." [ECF Doc. 202-14, ¶ 15].

But this Court is not bound by the language in the Forever MCA Agreement labeling the transactions as sale because under New York law, the characterization of a transaction as a true sale or a disguised loan turns of the substance of the transaction rather than its form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id.* (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

(1) Language of the documents and conduct of the parties;

(2) Recourse to the seller;

(3) Seller's retention of servicing and commingling of proceeds;

(4) Purchaser's failure to investigate the credit of the account debtor;

(5) Seller's right to excess collections;

(6) Purchaser's right to alter pricing terms;

(7) Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8) Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr.

12

D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that

13

a borrower might die or become insolvent, for example, is a risk that every lender takes . . . .").

The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted).

### A.    Under New York Law, the Forever MCA Agreement Is a Disguised Loan.

#### 1.    *The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.*

Several provisions in the Forever MCA Agreement work together effectively to shield Forever from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Forever MCA Agreement, Forever purportedly purchased "Receivables" generically identified as "all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business, for the payment of each Merchant's sale of good or services." [ECF Doc. 202-14, ¶ 1]. Because the Forever MCA Agreement identifies no particular revenue source, Forever bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no

14

specific receivables are identified in the Forever MCA Agreement bears strongly on the question of risk because the Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Forever is entitled to recover under the Forever MCA Agreement, so the direct risk of non-collectability remains with the Debtors.

Further, although ostensibly a sale of "future receipts" or "Receivables," Forever's collateral securing performance is substantially broader than the receivables purchased. Paragraph 29 of the Forever MCA Agreement provides:

> To secure each Merchant's performance obligations to FF under this Agreement and any future agreement with FF, each Merchant hereby grants to FF a security interest in collateral (the "Collateral"), that is defined collectively: **(a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Codes (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC.** The parties acknowledge and agree that any security interest granted to FF under other agreement between any Merchant or Guarantor and FF (the "Cross-Collateral") will secure the obligation hereunder and under this Agreement.

[ECF Doc. 202-14, ¶ 33 (emphasis added)]. Although not as extensive as the security interests discussed in *In re Shoot The Moon* and *Fleetwood Services, LLC*, Forever's security interest is still substantially broader than the receivables purportedly purchased; the collateral description includes "all deposit accounts," which gives Forever a security interest over virtually all of the Debtors' operating funds. "The fact that the documents contemplate a broad security package for

[Forever] to generally collaterize payment obligations in indicative of a loan, not a sale." *In re Shoot the Moon, LLC*, 635 B.R. at 815.

The Forever MCA Agreement also gives Forever rights and recourse against property in addition to its collateral. Indeed, the Forever MCA Agreement gives Forever direct access, control, and authority to sweep funds from the Debtors' bank account:

> The Receivables Purchased Amount shall be paid to FF by each Merchant **irrevocably authorizing only one depositing account acceptable to FF (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as FF receives payment in full of the Receivables Purchased Amount**. **Each Merchant hereby authorizes FF to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the dates of this Agreement** and will provide FF with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). FF is not responsible for any overdrafts or rejected transactions that may result from FF's ACH debiting the Specified Percentage amounts under the terms of this Agreement . . . .

[ECF Doc. 202-14, ¶ 1 (emphasis added)].[12] The Forever MCA Agreement also includes a personal guarantee executed by Kurt J. Crosby, guaranteeing "each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant." [ECF Docs. 202-14, ¶ G1]. And upon the occurrence of an event of default,[13] Forever can choose from a host of

---

[12] The Forever MCA Agreement further required the Debtor-borrower to

appoint a bank acceptable to FF, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide FF and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. **Merchant(s) shall authorize FF and/or its agent(s) to deduct the amounts owed to FF for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to FF by permitting FF to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable** absent FF's written consent.

[ECF Doc. 202-14, ¶ 6 (emphasis added)].

[13] Under the Forever MCA Agreement, an "Event of Default" occurs when:

(1) Any Merchant violates any term or covenant in this Agreement;

16

aggressive remedial provisions, labeled "Protections Against Default" in the Forever MCA

Agreement, including acceleration of the debt:

> The following Protections 1 through 7 may be invoked by FF, **immediately and without notice to any Merchant** . . . :
>
> Protection 1: **The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately**.
>
> Protection 2. **FF may enforce the provisions of the Guarantee** against Guarantor.
>
> Protection 3. FF may enforce its security interest in the Collateral identified in Section 33.
>
> Protection 4. FF may proceed to protect and enforce its rights and remedies by litigation or arbitration . . .
>
> Protection 6. **FF may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account** or otherwise, in an amount consistent with the terms of this Agreement.
>
> Protection 7. FF will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor and account debtor(s) on behalf of each Merchant. **Each Merchant hereby grants to FF an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints FF and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or**

---

(2) Any representation or warranty by any Merchant in any agreement with FF that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made; . . .

(14) Any Merchant causes any ACH debit to the Account by FF to be blocked or stopped without providing any advance written notice to FF, which notice may be given by e-mail to office@foreverfunding.co;

(15) Any Merchant prevents FF from collecting any part of the Receivables Purchased Amount;

[ECF Doc. 202-14, ¶ 34].

**check processor and account debtor(s) to make payment to FF as contemplated by this Section**.

[ECF Doc. 202-14, ¶ 17 (emphasis added)]; *see also* [ECF Doc. 202-14, ¶ 35 ("Remedies")].

A Debtor under the Forever MCA Agreement could fail to fund one sweep of its account—constituting an event of default, *see supra* note 13—and find itself subject to immediate acceleration of the full amount of the transaction outstanding **without notice**.  Under the Forever MCA Agreement, Forever can act as the Debtors' attorney-in-fact and force the Debtors to obtain new credit to pay amounts accelerated under the contract.  And if Forever is unable to recover its outstanding balance from the Debtor's bank account, Forever is entitled to chase full repayment from Kurt Crosby as guarantor of the debt.  Read in tandem, the provisions of the Forever MCA Agreement make it obvious that Forever bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtor's absolute payment obligation.  "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Forever MCA Agreement weigh in favor of finding the transactions to be disguised loans.  *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id*. at 248–50.  In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans.  As a whole, they provide [Forever] with at least conditional recourse and expanded legal rights against [the Debtor] entities and the personal guarantors.  Plus, they allocate great risk to the [Debtor] counterparty while protecting [Forever] with much more than just the receivables.  [Forever's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale.  Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

18

  2. *On balance, other hallmarks of the Forever MCA Agreement weigh in favor of the Court's conclusion that the agreement is disguised loans.*

At first glance, the Forever MCA Agreement appears to contain an indefinite term because they require the Debtors to continue to pay regular, installment amounts until they have fully paid the sum of "receivables" purportedly purchased. A contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But the Forever MCA Agreement has a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Forever's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in an event of default and accelerate the term without notice. And as also made clear above, Forever assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Forever MCA Agreement to be a disguised loan.

Finally, Paragraph 4 of the Forever MCA Agreement entitled "Reconciliations" allows the Debtors to request Forever to perform a reconciliation or accounting of sweeps taken from the Debtors' accounts with amounts owing under the agreement. [ECF Doc. 202-14, ¶ 4 ("Any Merchant may give written notice to FF requesting that FF conduct a reconciliation in order to ensure that the amount that FF has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement.")]. Under the agreement, the Debtors may seek reconciliation an unlimited number of times. *See id*. Two outcomes exist after reconciliation:

> If such reconciliation determines that FF collected more than it was entitled to, then FF will credit to the Account all amounts to which FF was not entitled within seven

19

days thereafter. If such reconciliation determines that FF collected less than it was entitled to, then FF will debit from the Account all additional amounts to which FF was entitled within seven days thereafter..

*Id.* Regardless of the outcome—as determined by Forever—the amounts owed by the Debtors under the Forever MCA Agreement are never reduced due to unforeseen adverse business developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Forever finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables from the Debtors.[14] For that reason, the Court finds that this particular reconciliation provision weighs in favor of a finding that the Forever MCA Agreement is not a true sale, but rather disguised loans.

## CONCLUSION

The Court thus concludes that the unambiguous terms of the Forever MCA Agreement substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making the agreement a disguised loan under New York law. The Court grants judgment as a matter of law in favor of the Debtors and against Forever as to Counts I, III, and IV of the Complaint.[15] Accordingly,

---

[14] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Forever MCA Agreement, the failure to fund one sweep results in an irremediable infraction that would foreclose any possibility of future reconciliation. Upon such an event of default, Forever may employ any or all of the "Protections Against Default" to ensure repayment under the Forever MCA Agreement is accomplished.

[15] The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Forever MCA Agreement to be disguised loans, it need not address the Debtors' alternative argument that, even if the Forever MCA Agreement is a true sale, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreement only purports to vest Forever with a capped or fractional interest in those accounts receivable. [ECF Doc. 202, at 44].

20

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Forever, and **DENIED IN PART** as to Count II of the Complaint as against Forever.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 18, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE