**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § § § § § § | CASE NO. 26-10678 (JOINTLY ADMINISTERED) |
| CROSBY MARINE TRANSPORTATION, LLC, | | CHAPTER 11 COMPLEX CASE |
| DEBTORS.[1] | | |

| | | |
|---|---|---|
| CROSBY TUGS, L.L.C., CROSBY DREDGING, LLC, CROSBY MARINE TRANSPORTATION, LLC, AND BERTUCCI CONTRACTING COMPANY, L.L.C., | § § § § § § | ADV. NO. 26-1018 |
| PLAINTIFFS, | § § | |
| V. | § § | |
| MEGED FUNDING GROUP A/K/A MEGED FUNDING GROUP CORP, ALLIANCE ENERGY SERVICES, LLC, ARENA OFFSHORE, CANTRELLE SERVICES LLC, CANTIUM LLC, CAJUN INDUSTRIES LLC, CHAMPAGNE ENERGY & ENVIRONMENTAL SOLUTIONS, CHEVRON PRODUCTION CO., CURTIN MARITIME, ECOSERV, LLC, ECOSERV ENVIRONMENTAL SERVICES, LLC, GAC NORTH AMERICA, INGRAM MARINE GROUP, JOHN W STONE OIL DISTRIBUTOR LLC, KENOSIS OPERATING COMPANY, KEVIN GROS CONSULTING, LOOP LLC, LUHR CROSBY LLC, MODERN AMERICAN RECYCLING, MARSHLAND EQUIPMENT RENTALS, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

---

[1] The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

| | |
|---|---|
| **MCDONOUGH MARINE SERVICE,** | § |
| **MORRISON OFFSHORE LLC,** | § |
| **PATRIOT MARINE SERVICES,** | § |
| **PORT OF IBERIA DISTRICT BOARD OF** | § |
| **COMMISSIONERS,** | § |
| **ROSE CAY MARITIME LLC,** | § |
| **SABINE NECHES NAVIGATION DISTRICT,** | § |
| **SPACE EXPLORATION TECHNOLOGIES,** | § |
| **TALA ENVIRONMENTAL LLC,** | § |
| **THOM-SEA BOAT BUILDERS,** | § |
| **TK TOWING INC.,** | § |
| **TPC GROUP LLC,** | § |
| **TRITON DIVING SERVICES LLC,** | § |
| **T&T MARINE SALVAGE INC.,** | § |
| **VENTURE GLOBAL CALCASIEU PASS LLC,** | § |
| **WALTER OIL & GAS,** | § |
| **WHITE FLEET DRILLING,** | § |
| **HEEREMA MARINE CONTRACTORS** | § |
| **NEDERLAND, S.E.,** | § |
| **AQUA CAPITAL LLC.,** | § |
| **BREEZE FUNDING,** | § |
| **CELTIC ADVANCE,** | § |
| **EN OD CAPITAL,** | § |
| **ALO ADVANCE,** | § |
| **CEDAR ADVANCE LLC,** | § |
| **CLEARFUND SOLUTIONS, LLC,** | § |
| **COLDWATER CAPITAL, LLC,** | § |
| **COOPER INVESTMENTS, LLC,** | § |
| **DEPENDENCE PLATINUM,** | § |
| **FOREVER FUNDING LLC,** | § |
| **FREEDOM FUNDING LLC,** | § |
| **GALT FUNDING CO,** | § |
| **INSIGHT CAPITAL LLC,** | § |
| **LIBERTAS FUNDING, LLC,** | § |
| **MOBY CAPITAL LLC D/B/A MOBYCAP,** | § |
| **MYNT GOLD, LLC A/K/A MYNT ADVANCE,** | § |
| **NOVAC EQUITIES LLC,** | § |
| **ODK CAPITAL, LLC D/B/A ON DECK,** | § |
| **ORACAP LLC,** | § |
| **OVERTIME CAPITAL,** | § |
| **PARKVIEW ADVANCE LLC,** | § |
| **PINNACLE BUSINESS FUNDING LLC,** | § |
| **RELIANCE FINANCIAL FL, LLC,** | § |
| **ROCKET CAPITAL NY, LLC.** | § |
| **SQ ADVANCE,** | § |
| **SURGE FUNDING LLC,** | § |
| **TRUE BUSINESS FUNDING LLC,** | § |
| **WEB BANK C/O LIBERTAS FUNDING LLC, &** | § |
| **WYNWOOD CAPITAL GROUP, LLC,** | § |
| | § |
| **DEFENDANTS.** | |

2

**MEMORANDUM OPINION AND ORDER**

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint"). [ECF Doc. 1]. Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5). *See id*.

Before the Court is the *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202]. The Debtors seek summary judgment against Wynwood Capital Group, LLC ("Wynwood") on Counts 1–4 of their Complaint. The Debtors submitted a statement of uncontested facts, [ECF Doc. 202-1], and Wynwood filed an opposition to the MPSJ, [ECF Doc. 272], and a counterstatement of material facts, [ECF Doc. 272-2].[3] The

---

[2]    Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

[3]    MCA Defendants Cedar Advance LLC, Forever Funding LLC, Insight Capital LLC, and SQ Advance, joined in Wynwood's opposition. The Court has issued a separate *Memorandum Opinion and Order* as to each defendant.

Debtors filed a reply brief in support of the MPSJ. [ECF Doc. 292]. In short: The Debtors assert that the text of the MCA Agreements executed among Crosby entities and Wynwood is unambiguous and reveals that the agreements are disguised loans as a matter of law. [ECF Doc. 202 & 292, ¶ 5]. Wynwood does not dispute that the text of MCA Agreements is unambiguous and asserts that the agreements are by their terms true sales. [ECF Doc. 272]. At the same time, however, Wynwood also asserts that summary judgment is premature because it has not been given adequate time to conduct discovery to make a complete summary judgment record. *See id.* In their reply, the Debtors repeat the standard contract-interpretation principle that where the language of an agreement is unambiguous, a court must look only at the "four corners" of the agreement (and not to any extrinsic evidence) to interpret the contract as a matter of law, which precludes the need for further discovery here. [ECF Doc. 292, ¶ 6]. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry. [ECF Docs. 202-47, ¶ 8 & 202-48]. The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet. [ECF Doc.

202-47, ¶¶ 23 & 28]. Crosby Tugs assists small freighters, container ships, aircraft carriers, very large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible rigs, landing platforms, and other vessels. [ECF Doc. 202-47, ¶ 23]. Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses. *See id.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable"). [ECF Doc. 202-1, ¶ 9; ECF Doc. 272-2]. Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint. [ECF Doc. 202-1, ¶ 10; ECF Doc. 272-2]. As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[4] consisting of current accounts receivable in the amount of $5,755,785.29,[5] and past-due accounts receivable in the amount of $5,084,853.16,[6] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[7] consisting of current accounts receivable in the amount of $602,297.63,[8] and past-due accounts receivable in the amount of $7,271,748.74.[9] [ECF Doc. 202-1, ¶ 11; ECF Doc. 272-2].

---

[4] *See* Complaint, Ex. B, Crosby Tugs, Column G.

[5] *See* Complaint, Ex. B, Crosby Tugs, Column D.

[6] *See* Complaint, Ex. B, Crosby Tugs, Column F.

[7] *See* Complaint, Ex. B, Crosby Dredging, Column G.

[8] *See* Complaint, Ex. B, Crosby Dredging, Column D.

[9] *See* Complaint, Ex. B, Crosby Dredging, Column F.

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA Defendants executed the following prepetition MCA Agreements:

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |

6

| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |
|---|---|---|---|---|
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 30 | *Business Loan and Security Agreement* | OnDeck \| ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |

7

| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
|---|---|---|---|---|
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |
| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 272-2].   The Debtors and Wynwood do not dispute that on February 20, 2025, and March 11, 2025, they entered into the agreements attached as Exhibits 44 and 45 to the Debtors' MPSJ and that those agreements are true and correct copies. [ECF Docs. 202-45 & 202-46; ECF Doc. 202-1, ¶ 24; ECF Doc. 272].   The basic terms of the agreement are:

- On February 20, 2025, Kurt J. Crosby, on behalf of "Crosby Dredging LLC" and individually as Guarantor, entered into a "Revenue Purchase Agreement" with Wynwood for the "purchase" of the Debtor's "Future Receipts" in the amount of $2,718,300.00, for and "in consideration of a "Purchase Price" of $1.7 million (the "First Wynwood MCA Agreement").  [ECF Doc. 202-45, at 1 & ¶ 1].

- On March 11, 2025, Kurt J. Crosby, on behalf of "Crosby Dredging LLC" and individually as Guarantor, entered into a "Revenue Purchase Agreement" with Wynwood for the "purchase" of the Debtor's "Future Receipts" in the amount of $1.5 million for and "in consideration of a "Purchase Price" of $1 million (the "Second Wynwood MCA Agreement" and, with the First Wynwood MCA Agreement, the "Wynwood MCA Agreements"). [ECF Doc. 202-46, at 1 & ¶ 1].

**DISCUSSION**

A.      **Summary Judgment Standard**

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*,

8

909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").[10]

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show

---

[10]    Wynwood argues that the Debtors' MPSJ is premature because it "no meaningful discovery has occurred," [ECF Doc. 272, at 2], but Wynwood has not pointed to any ambiguous language in the Wynwod MCA Agreements that would require the consideration of extrinsic evidence here. Indeed, "[u]nder New York law, when contract language is clear and unambiguous, contracts should be interpreted based on the plain, non-technical meaning of the language of the agreement itself." *Musket Corp. v. Suncor Energy (U.S.A.) Mkt'g, Inc.*, 759 F. App'x 280 290 (5th Cir. 2019) (citing New York cases). "Courts must not consider extrinsic evidence to determine the parties' intentions when contract language is clear." *Id.* (citation omitted). "Where a court can determine the parties' intent from the face of the contract, interpretation is a matter of law and the case is ripe for summary judgment." *Id.* at 291 (internal quotations and citation omitted). The Court finds that the language in the Wynwood MCA Agreements is unambiguous; therefore, any extrinsic evidence that Wynwood would obtain through discovery would necessarily be immaterial facts with respect to the Debtors' MPSJ and thus would not defeat the Debtors' MPSJ under Rule 56.

that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

**B.**    **Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g., Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. § 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Wynwood MCA Agreements are true sales as they are identified on the face of the agreements, or whether the Court should recharacterize the purported sales as disguised loans based on the substance of the agreements for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed all of the Wynwood MCA Agreements prepetition. If the Wynwood MCA Agreements are true sales of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Wynwood MCA

Agreements are disguised loans, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties do not dispute that their respective interests in certain of the Crosby Accounts Receivable under the Wynwood MCA Agreements are governed by New York law pursuant to choice-of-law provisions in the contracts. [ECF Docs. 202 & 272]. New York's general rule of contract interpretation is that "agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (internal quotations and citation omitted). Indeed, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

When determining whether a contract evidences a sale or a loan, New York law requires courts look to substance over form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls." (citation omitted)); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, No. 25-3004, 2025 WL 1934205, at *5 (Bankr. N.D. Ohio July 14, 2025) (under New York law, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether the economic risk of ownership truly transferred to the purported buyer" (citing cases)).[11]  Courts

---

[11]  It is true that the plain language of the Wynwood MCA Agreements describes the transactions as "sales":

- The agreement lists a "Purchase Price" and states: "This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below)." [ECF Doc. 202-45, at 1].

11

applying New York law have identified various non-exclusive hallmarks to evaluate whether a purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id.* (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

(1)      Language of the documents and conduct of the parties;

(2)      Recourse to the seller;

---

- Paragraph 1 of the agreement entitled "Sale of Future Receipts" states: "Merchant(s) hereby sell, assign, and transfer to WCG (making WCG the absolute owner) in consideration of the funds provided for ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or third party payors . . . ." [ECF Doc. 202-45, ¶ 1].

- Paragraph 14 of the agreement entitled "Sale of Receivables" states: "Each Merchant and WCG agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from WCG to any Merchant." [ECF Doc. 202-45, ¶ 14].

But this Court is not bound by the language in the Wynwood MCA Agreements labeling the transactions as sales because under New York law, the characterization of a transaction as a true sale or a disguised loan turns on the substance of the transaction rather than its form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

(3)     Seller's retention of servicing and commingling of proceeds;

(4)     Purchaser's failure to investigate the credit of the account debtor;

(5)     Seller's right to excess collections;

(6)     Purchaser's right to alter pricing terms;

(7)     Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8)     Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually

13

reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that a borrower might die or become insolvent, for example, is a risk that every lender takes . . . ."). The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted).

14

C.      **Under New York Law, the Wynwood MCA Agreements Are Disguised Loans.**

> 1.      *The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.*

Several provisions in the Wynwood MCA Agreements work together effectively to shield Wynwood from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Wynwood MCA Agreements, Wynwood purportedly purchased "Receivables" generically identified as "all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each Merchant's business [], for the payments of each Merchant's sale of goods or services." [ECF Doc. 202-45, ¶ 1].[12] Because the Wynwood MCA Agreements identify no particular revenue source, Wynwood bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no specific receivables are identified in the Wynwood MCA Agreements bears strongly on the question of risk because the Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Wynwood is entitled to recover under the Wynwood MCA Agreements, so the direct risk of non-collectability remains with the Debtors.

Further, although ostensibly a sale of "Future Receipts" or "Receivables," Wynwood's collateral securing performance is substantially broader than the receivables purchased. The Wynwood MCA Agreements provide:

> To secure each Merchant's performance obligations to WCG under this Agreement and any future agreement with WCG, each Merchant hereby grants to WCG a security interest in collateral (the "Collateral"), that is defined collectively:

---

[12]     Any references herein to the operative terms of the First Wynwood MCA Agreement includes identical provisions contained within the Second Wynwood MCA Agreement.

15

**(a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Codes (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC.** The parties acknowledge and agree that any security interest granted to WCG under other agreement between any Merchant or Guarantor and WCG (the "Cross-Collateral") will secure the obligation hereunder and under this Agreement.

[ECF Doc. 202-45, ¶ 29 (emphasis added)]. Although not as extensive as the security interests discussed in *In re Shoot The Moon* and *Fleetwood Services, LLC*, Wynwood's security interest is still substantially broader than the receivables purportedly purchased; the collateral description includes "all deposit accounts," which gives Wynwood a security interest over virtually all of the Debtors' operating funds. "The fact that the documents contemplate a broad security package for [Wynwood] to generally collateralize payment obligations is indicative of a loan, not a sale." *In re Shoot the Moon, LLC*, 635 B.R. at 815.

The Wynwood MCA Agreements also give Wynwood rights and recourse against property in addition to its collateral. Indeed, the Wynwood MCA Agreements give Wynwood direct access, control, and authority to sweep funds from the Debtors' bank account:

The Receivables Purchased Amount shall be paid to WCG by each Merchant **irrevocably authorizing only one depositing account acceptable to WCG (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as WCG receives payment in full of the Receivables Purchased Amount**. **Each Merchant hereby authorizes WCG to ACH debit in one or more ACH transactions the specified remittances and any applicable fees listed in Section 2 from the Account on a daily basis (unless a different frequency is provided for herein) as of the next business day (or designated day of each week in the case of weekly payments) after the dates of this Agreement** and will provide WCG with all required logins, passwords, access codes, and monthly bank statements. Each Merchant understands that it will be held responsible for any overdrafts or rejected transactions that may result from a rejected ACH attempt or an Event of Default (see Section 2). WCG is not responsible for any overdrafts or rejected transactions that may result from WCG's

16

ACH debiting the Specified Percentage amounts under the terms of this Agreement
. . . .

[ECF Doc. 202-45, ¶ 1 (emphasis added)].[13]  The Wynwood MCA Agreements also include a

personal guarantee executed by Kurt J. Crosby, guaranteeing "each Merchant's performance of all

of the representations, warranties, and covenants made by each Merchant." [ECF Docs. 202-45,

¶ G1].  And upon the occurrence of an event of default,[14] Wynwood can choose from a host of

---

[13]     The Wynwood MCA Agreements further required the Debtor-borrower to

appoint a bank acceptable to WCG, to obtain electronic fund transfer services and/or "ACH" payments.  Merchant(s) shall provide WCG and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables.  **Merchant(s) shall authorize WCG and/or its agent(s) to deduct the amounts owed to WCG for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to WCG by permitting WCG to withdraw the Specified Percentage by ACH debiting of the account.  The authorization shall be irrevocable** as to each Merchant absent WCG's written consent until the Receivables Purchased Amount has been paid in full or the Merchant becomes bankrupt or goes out of business without any prior default under this Agreement.

[ECF Doc. 202-45, ¶ 5 (emphasis added)].

[14]     Under the Wynwood MCA Agreements, an "Event of Default" occurs when:

(1) Any representation or warranty by any Merchant to WCG proves to have been made intentionally false or misleading in any material respect when made;

(2) Any Merchant causes any ACH debit to the Account by WCG to be blocked or stopped without providing any advance written notice to WCG with an alternative method for WCG to collect the blocked or stopped payment . . . ;

(3) Any Merchant intentionally prevents WCG from collecting any part of the Receivables Purchased Amount; or

(4) Any Merchant causes any ACH debit to the  Account by any person or entity other than WCG to be stopped or otherwise returned that would result in an ACH Return Code . . . and that Merchant does not within two business days thereafter provide WCG with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned . . . .

[ECF Doc. 202-45, ¶ 30].

aggressive remedial provisions, labeled "Protections against Default" in the Wynwood MCA

Agreements, including acceleration of the debt:

> The following Protections 1 through 6 may be invoked by WCG, **immediately and without notice to any Merchant** if any Event of Default listed in Section 30 has occurred.
>
> Protection 1:  **The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately**.
>
> Protection 2.  **WCG may enforce the provisions of the Guarantee** against Guarantor.
>
> Protection 3.  WCG may enforce its security interest in the Collateral identified in Section 29.
>
> Protection 4.  WCG may proceed to protect and enforce its rights and remedies by litigation or arbitration.
>
> Protection 5.  **WCG may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account** or otherwise, in an amount consistent with the terms of this Agreement.
>
> Protection 6.  WCG will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor and account debtor(s) . . . on behalf of each Merchant.  **Each Merchant hereby grants to WCG an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints WCG and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor and account debtor(s) to make payment to WCG as contemplated by this Section**.

[ECF Doc. 202-45, ¶ 16 (emphasis added)]; *see also* [ECF Doc. 202-45, ¶ 31 ("Remedies")].

A Debtor under a Wynwood MCA Agreement could fail to fund one sweep of its account—

constituting an event of default, *see supra* note 14—and find itself subject to immediate

acceleration of the full amount of the transaction outstanding **without notice**.  Under the Wynwood

MCA Agreements, Wynwood can act as the Debtors' attorney-in-fact and force the Debtors to

obtain new credit to pay amounts accelerated under the contract.  And if Wynwood is unable to

recover its outstanding balance from the Debtors' bank account, Wynwood is entitled to chase full repayment from Kurt Crosby as guarantor of the debt. Read in tandem, the provisions of the Wynwood MCA Agreements make it obvious that Wynwood bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtors' absolute payment obligation. "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Wynwood MCA Agreements weigh in favor of finding the transactions to be disguised loans. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id*. at 248–50. In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans. As a whole, they provide [Wynwood] with at least conditional recourse and expanded legal rights against [the Debtor] entities and the personal guarantors. Plus, they allocate great risk to the [Debtor] counterparty while protecting [Wynwood] with much more than just the receivables. [Wynwood's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

> 2. *On balance, other hallmarks of the Wynwood MCA Agreements weigh in favor of the Court's conclusion that the agreements are disguised loans.*

At first glance, the Wynwood MCA Agreements appear to contain an indefinite term because they require the Debtors to continue to pay regular, installment amounts until they have fully paid the sum of "receivables" purportedly purchased. A contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-

19

9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But each Wynwood MCA Agreement has a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Wynwood's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in an event of default and accelerate the term without notice. And as also made clear above, Wynwood assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Wynwood MCA Agreements to be disguised loans.

Finally, Paragraph 4 of the Wynwood MCA Agreements entitled "Reconciliations" allows the Debtors to request Wynwood to perform a reconciliation or accounting of sweeps taken from the Debtors' accounts with amounts owing under the agreement. [ECF Doc. 202-45, ¶ 4 ("Any Merchant may contact WCG's Reconciliation Department to request that WCF conduct a reconciliation in order to ensure that the amount that WCG has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement.")]. Under the agreements, the Debtors may seek reconciliation an unlimited number of times. *See id*. Two outcomes exist after reconciliation:

> If a reconciliation determines that WCG collected more than it was entitled to, then WCG will credit to the Account all amounts to which WCG was not entitled and, if there is an Estimated Payment, decrease the amount of the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. [But] [i]f a reconciliation determines that WCG collected less than it was entitled to, then WCG will debit from the Account all additional amounts to which WCG was entitled and, if there is an Estimated Payment, increase the amount of the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation.

*Id*. Regardless of the outcome—as determined by Wynwood—the amounts owed by the Debtors under the Wynwood MCA Agreements are never reduced due to unforeseen adverse business

developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Wynwood finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables from the Debtors.[15] For that reason, the Court finds that this particular reconciliation provision weighs in favor of a finding that the Wynwood MCA Agreements are not true sales, but rather disguised loans.

## CONCLUSION

The Court thus concludes that the unambiguous terms of the Wynwood MCA Agreements substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making those agreements disguised loans under New York law. The Court grants judgment as a matter of law in favor of the Debtors and against Wynwood as to Counts I, III, and IV of the Complaint.[16] Accordingly,

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Wynwood, and **DENIED IN PART** as to Count II of the Complaint as against Wynwood.

---

[15] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Wynwood MCA Agreements, the failure to fund one sweep results in an irremediable infraction that would foreclose any possibility of future reconciliation. Upon such an event of default, Wynwood may employ any or all of the "Protections against Default" to ensure repayment under the Wynwood MCA Agreements is accomplished.

[16] The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Wynwood MCA Agreements to be disguised loans, it need not address the Debtors' alternative argument that, even if the Wynwood MCA Agreements are true sales, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreements only purport to vest Wynwood with a capped or fractional interest in those accounts receivable. [ECF Doc. 202, at 44].

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 18, 2026.

_____

MEREDITH S. GRABILL

UNITED STATES BANKRUPTCY JUDGE