**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| DEBTORS.[1] | § | |

| | | |
|---|---|---|
| | § | |
| **CROSBY TUGS, L.L.C., CROSBY DREDGING,** | § | |
| **LLC, CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC, AND BERTUCCI CONTRACTING** | § | |
| **COMPANY, L.L.C.,** | § | **ADV. NO. 26-1018** |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| **MEGED FUNDING GROUP A/K/A MEGED** | § | |
| **FUNDING GROUP CORP,** | § | |
| **ALLIANCE ENERGY SERVICES, LLC,** | § | |
| **ARENA OFFSHORE,** | § | |
| **CANTRELLE SERVICES LLC,** | § | |
| **CANTIUM LLC,** | § | |
| **CAJUN INDUSTRIES LLC,** | § | |
| **CHAMPAGNE ENERGY & ENVIRONMENTAL** | § | |
| **SOLUTIONS,** | § | |
| **CHEVRON PRODUCTION CO.,** | § | |
| **CURTIN MARITIME,** | § | |
| **ECOSERV, LLC,** | § | |
| **ECOSERV ENVIRONMENTAL SERVICES,** | § | |
| **LLC,** | § | |
| **GAC NORTH AMERICA,** | § | |
| **INGRAM MARINE GROUP,** | § | |
| **JOHN W STONE OIL DISTRIBUTOR LLC,** | § | |
| **KENOSIS OPERATING COMPANY,** | § | |
| **KEVIN GROS CONSULTING,** | § | |
| **LOOP LLC,** | § | |
| **LUHR CROSBY LLC,** | § | |
| **MODERN AMERICAN RECYCLING,** | § | |
| **MARSHLAND EQUIPMENT RENTALS,** | § | |
| | § | |

---

[1]  The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

| | |
|---|---|
| **MCDONOUGH MARINE SERVICE,** | § |
| **MORRISON OFFSHORE LLC,** | § |
| **PATRIOT MARINE SERVICES,** | § |
| **PORT OF IBERIA DISTRICT BOARD OF** | § |
| **COMMISSIONERS,** | § |
| **ROSE CAY MARITIME LLC,** | § |
| **SABINE NECHES NAVIGATION DISTRICT,** | § |
| **SPACE EXPLORATION TECHNOLOGIES,** | § |
| **TALA ENVIRONMENTAL LLC,** | § |
| **THOM-SEA BOAT BUILDERS,** | § |
| **TK TOWING INC.,** | § |
| **TPC GROUP LLC,** | § |
| **TRITON DIVING SERVICES LLC,** | § |
| **T&T MARINE SALVAGE INC.,** | § |
| **VENTURE GLOBAL CALCASIEU PASS LLC,** | § |
| **WALTER OIL & GAS,** | § |
| **WHITE FLEET DRILLING,** | § |
| **HEEREMA MARINE CONTRACTORS** | § |
| **NEDERLAND, S.E.,** | § |
| **AQUA CAPITAL LLC.,** | § |
| **BREEZE FUNDING,** | § |
| **CELTIC ADVANCE,** | § |
| **EN OD CAPITAL,** | § |
| **ALO ADVANCE,** | § |
| **CEDAR ADVANCE LLC,** | § |
| **CLEARFUND SOLUTIONS, LLC,** | § |
| **COLDWATER CAPITAL, LLC,** | § |
| **COOPER INVESTMENTS, LLC,** | § |
| **DEPENDENCE PLATINUM,** | § |
| **FOREVER FUNDING LLC,** | § |
| **FREEDOM FUNDING LLC,** | § |
| **GALT FUNDING CO,** | § |
| **INSIGHT CAPITAL LLC,** | § |
| **LIBERTAS FUNDING, LLC,** | § |
| **MOBY CAPITAL LLC D/B/A MOBYCAP,** | § |
| **MYNT GOLD, LLC A/K/A MYNT ADVANCE,** | § |
| **NOVAC EQUITIES LLC,** | § |
| **ODK CAPITAL, LLC D/B/A ON DECK,** | § |
| **ORACAP LLC,** | § |
| **OVERTIME CAPITAL,** | § |
| **PARKVIEW ADVANCE LLC,** | § |
| **PINNACLE BUSINESS FUNDING LLC,** | § |
| **RELIANCE FINANCIAL FL, LLC,** | § |
| **ROCKET CAPITAL NY, LLC.** | § |
| **SQ ADVANCE,** | § |
| **SURGE FUNDING LLC,** | § |
| **TRUE BUSINESS FUNDING LLC,** | § |
| **WEB BANK C/O LIBERTAS FUNDING LLC, &** | § |
| **WYNWOOD CAPITAL GROUP, LLC,** | § |

      **DEFENDANTS.**

## MEMORANDUM OPINION AND ORDER

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint"). [ECF Doc. 1]. Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5). *See id*.

Before the Court is the *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202]. The Debtors seek summary judgment against Moby Capital I, LLC ("Moby") on Counts 1–4 of their Complaint. The Debtors submitted a statement of uncontested facts, [ECF Doc. 202-1], and Moby filed an opposition to the MPSJ, [ECF Doc. 279], and a counterstatement of material facts, [ECF Doc. 279-2]. In short: The Debtors assert that the text of the MCA Agreement executed between Crosby entities and Moby is unambiguous

---

[2]    Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

and reveals that the agreement is a disguised loan as a matter of law. [ECF Doc. 292, ¶ 5]. Moby agrees that the text of the MCA Agreement is unambiguous but asserts that the agreement is a true sale of the Debtors' receivables as a matter of law. [ECF Doc. 279, at 8]. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry. [ECF Docs. 202-47, ¶ 8 & 202-48]. The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet. [ECF Doc. 202-47, ¶¶ 23 & 28]. Crosby Tugs assists small freighters, container ships, aircraft carriers, very large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible rigs, landing platforms, and other vessels. [ECF Doc. 202-47, ¶ 23]. Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses. *See id.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable"). [ECF Doc. 202-1,

¶ 9; ECF Doc. 279-1].  Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint.  [ECF Doc. 202-1, ¶ 10; ECF Doc. 279-1].  As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[3] consisting of current accounts receivable in the amount of $5,755,785.29,[4] and past-due accounts receivable in the amount of $5,084,853.16,[5] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[6] consisting of current accounts receivable in the amount of $602,297.63,[7] and past-due accounts receivable in the amount of $7,271,748.74.[8]  [ECF Doc. 202-1, ¶ 11; ECF Doc. 279-1].

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA Defendants executed the following prepetition MCA Agreements:

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |

---

[3]    *See* Complaint, Ex. B, Crosby Tugs, Column G.

[4]    *See* Complaint, Ex. B, Crosby Tugs, Column D.

[5]    *See* Complaint, Ex. B, Crosby Tugs, Column F.

[6]    *See* Complaint, Ex. B, Crosby Dredging, Column G.

[7]    *See* Complaint, Ex. B, Crosby Dredging, Column D.

[8]    *See* Complaint, Ex. B, Crosby Dredging, Column F.

| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
|---|---|---|---|---|
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |
| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |

6

| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
|---|---|---|---|---|
| 30 | *Business Loan and Security Agreement* | OnDeck \| ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |
| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |
| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 279-1]. The Debtors and Moby do not dispute that on June 30, 2025, they entered into the agreement attached as Exhibit 23 to the Debtors' MPSJ, and that this agreement is a true and correct copy. [ECF Doc. 202-24; ECF Doc. 202-1, ¶ 24; ECF Doc. 279-1]. The basic terms of the agreement are:

On May 12, 2025, Kurt J. Crosby, on behalf of "Crosby Enterprises, L.L.C., et al." and individually as Guarantor, entered into an "Agreement of Sale of Future Receipts" with Moby for the "purchase" of the Debtors' "Future Receipts" in the amount of $3,621,356.30 for and "in consideration of" a "Purchase Price" of $2,586,683.07 (the "Moby MCA Agreement"). [ECF Doc. 202-24, at 1, ¶ 1 & 13].

7

**DISCUSSION**

A.      **Summary Judgment Standard**

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court."  *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times.  *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).  "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment."  *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *See Celotex*, 477 U.S. at 317.  Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted).  Where the

8

nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

**B.      Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g.*, *Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. §§ 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Moby MCA Agreement is a true sale as it is identified on the face of the agreement, or whether the Court should recharacterize the purported sale as a disguised loan based on the substance of the agreement for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed the Moby MCA Agreement prepetition. If the Moby MCA Agreement is a true sale of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Moby MCA Agreement is a

disguised loan, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties do not dispute that their respective interests in certain of the Crosby Accounts Receivable under the Moby MCA Agreement are governed by New York law pursuant to choice-of-law provisions in the contract. [ECF Docs. 201 & 279]. New York's general rule of contract interpretation is that "agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (internal quotations and citation omitted). Indeed, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

When determining whether a contract evidences a sale or a loan, New York law requires courts look to substance over form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls." (citation omitted)); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, No. 25-3004, 2025 WL 1934205, at *5 (Bankr. N.D. Ohio July 14, 2025) (under New York law, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether the economic risk of ownership truly transferred to the purported buyer" (citing cases)).[9] Courts

---

[9] It is true that the plain language of the Moby MCA Agreement describes the transaction as a "sale":

- The agreement lists a "Purchase Price," defined as the "total amount that Purchaser agrees to pay for the Amount Sold." [ECF Doc. 202-24, at 2].

- Paragraph 1 of the agreement entitled "Sale of Future Receipts; Not a Loan" states: "Merchant and Purchaser agree that the purchase price is payment for the assignment and sale of the

10

applying New York law have identified various non-exclusive hallmarks to evaluate whether a purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id*. (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

(1)     Language of the documents and conduct of the parties;

(2)     Recourse to the seller;

(3)     Seller's retention of servicing and commingling of proceeds;

(4)     Purchaser's failure to investigate the credit of the account debtor;

(5)     Seller's right to excess collections;

(6)     Purchaser's right to alter pricing terms;

---

Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. [ECF Doc. 202-24, ¶ 1].

But this Court is not bound by the language in the Moby MCA Agreement labeling the transactions as sale because under New York law, the characterization of a transaction as a true sale or a disguised loan turns of the substance of the transaction rather than its form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

(7)     Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8)     Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at \*3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that a borrower might die or become insolvent, for example, is a risk that every lender takes . . . ."). The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted).

    **A.**    **Under New York Law, the Moby MCA Agreement Is a Disguised Loan.**

    *1.*    *The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.*

Several provisions in the Moby MCA Agreement work together effectively to shield Moby from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Moby MCA Agreement, Moby purportedly purchased "Future Receipts"

generically identified as "All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business." [ECF Doc. 202-24, at 2]. Because the Moby MCA Agreement identifies no particular revenue source, Moby bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no specific receivables are identified in the Moby MCA Agreement bears strongly on the question of risk because the Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Moby is entitled to recover under the Moby MCA Agreement, so the direct risk of non-collectability remains with the Debtors.

The Moby MCA Agreement also gives Moby direct access, control, and authority to sweep funds from the Debtors' bank account:

> Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). **Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each week the Weekly Delivery Amount via ACH debit** . . . .

[ECF Doc. 202-24, ¶ 3.a].[10] The Moby MCA Agreement also includes a personal guarantee executed by Kurt J. Crosby, "irrevocably, absolutely and unconditionally guarantee[ing] that the Merchant will not breach the Merchant obligations." [ECF Doc. 202-24, ¶ 33]. And upon the

---

[10] The Moby MCA Agreement further provides that "Merchant hereby **authorizes Purchaser to debit the Weekly Delivery amount from the Approved Bank Account** or the Lockbox Account, as applicable, via ACH or electronic checks. [ECF Doc. 202-24, ¶ 4].

While paragraph 3 of the Moby MCA Agreement describes three possible methods of payment, page 2 provides that ACH is the "method of remittance" under the agreement. *Id.* at 2 & ¶ 3.

14

occurrence of an event of default (also referred to as "Bad Acts" in the agreement),[11] Moby can

choose from a host of aggressive remedial provisions under the Moby MCA Agreement, including

acceleration of the debt:

> 25. **Remedies**. If you commit a Bad Act, and fail to cure the Bad Act by reversing it within (5) Business Days of the occurrence thereof, **you will be liable to us in an amount in cash equal to (i) the undelivered portion of the Amount sold**, plus **(ii) any other fees and other amounts due to us under this Agreement, plus (iii) any additional amounts you would owe us for committing an Other Breach** . . . . You agree to pay us the amounts due or we may (a) **withdraw such amounts from the Approved Bank Account** . . . ; (b) **direct the Approved Card Processor . . . to deliver all of your Future Receipts to us** until we have received the Completion Amount; (c) enforce our rights as a secured creditor under the UCC . . . . ; (d) **enforce Owner/Guarantor's personal guaranty** of performance provisions of this Agreement against the Owner/Guarantor(s) without first seeking recourse from merchant; (e) commence a suit in equity or by action at law, or both . . . .

---

[11] Under the Moby MCA Agreement, "Events of Default" are defined to include the following:

**24.    Events of Default by Merchant.** The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a.    **Bad Acts**. If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount, you will be in default:

  i.    you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Sold . . . ;

  ix.    you process any card transaction through a payment card processor other than the Approved Card Processor;

  xi.    you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account . . . ;

  xii.    you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account . . . ;

  xiii.    you commit any act or omission specified in this Agreement to be a material breach. . . .

b.    **Other Breaches**. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

[ECF Doc. 202-24, ¶ 24].

[ECF Doc. 202-24, ¶ 25 (emphasis added)].

A Debtor under the Moby MCA Agreement could fail to fund one sweep of its account—constituting an event of default, *see supra* note 11—and find itself subject to acceleration of the full amount of the transaction outstanding if the default is not cured within five days.  Under the Moby MCA Agreement, Moby can act as the Debtors' attorney-in-fact and force the Debtors to obtain new credit to pay amounts accelerated under the contract.  And if Moby is unable to recover its outstanding balance from the Debtor's bank account, Moby is entitled to chase full repayment from Kurt Crosby as guarantor of the debt.  Read in tandem, the provisions of the Moby MCA Agreement make it obvious that Moby bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtor's absolute payment obligation.  "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Moby MCA Agreement weigh in favor of finding the transactions to be disguised loans. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id*. at 248–50.  In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans.  As a whole, they provide [Moby] with at least conditional recourse and expanded legal rights against [the Debtor] entities and the personal guarantors.  Plus, they allocate great risk to the [Debtor] counterparty while protecting [Moby] with much more than just the receivables.  [Moby's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale.  Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

> 2.     *On balance, other hallmarks of the Moby MCA Agreement weigh in favor of the Court's conclusion that the agreement is a disguised loan.*

At first glance, the Moby MCA Agreement appears to contain an indefinite term because it requires the Debtors to continue to pay regular, installment amounts until they have fully paid

16

the sum of "receivables" purportedly purchased. A contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But the Moby MCA Agreement has a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Moby's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in an event of default and accelerate the term without notice. And as also made clear above, Moby assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Moby MCA Agreement to be a disguised loan.

Finally, paragraph 10 of the Moby MCA Agreement entitled "Merchant's Right to Reconciliation of Weekly Deliveries" allows the Debtors to request Moby to perform a reconciliation or accounting of sweeps taken from the Debtors' accounts with amounts owing under the agreement. [ECF Doc. 202-24, ¶ 10 ("Merchant shall have the right . . . to request retroactive reconciliation of any difference between the Weekly Delivery Amounts received by Purchaser through the four Weekly deliveries immediately preceding the day when such request for reconciliation is received by Purchaser . . . and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.")]. Under the agreement, the Debtors may seek reconciliation an unlimited number of times. *See id.*, ¶ 11.c. Two outcomes exist after reconciliation:

> Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the

17

Merchant's request for reconciliation by **either crediting or debiting the difference** back to or from the Approved Bank Account or the Lockbox Account, as applicable . . . .

*Id*, ¶ 10.b. Regardless of the outcome—as determined by Moby—the amounts owed by the Debtors under the Moby MCA Agreement are never reduced due to unforeseen adverse business developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Moby finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables from the Debtors.[12] For that reason, the Court finds that this particular reconciliation provision weighs in favor of a finding that the Moby MCA Agreement is not a true sale, but rather disguised loans.

### CONCLUSION

The Court thus concludes that the unambiguous terms of the Moby MCA Agreement substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making the agreement a disguised loan under New York law. The Court grants judgment as a matter of law in favor of the Debtors and against Moby as to Counts I, III, and IV of the Complaint.[13] Accordingly,

---

[12] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Moby MCA Agreement, the failure to fund one sweep results in an irremediable infraction that would foreclose any possibility of future reconciliation. Upon such an event of default, Moby may employ any or all of the "Protections Against Default" to ensure repayment under the Moby MCA Agreement is accomplished.

[13] The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Moby MCA Agreement to be a disguised loan, it need not address the Debtors' alternative argument that, even if the Moby MCA Agreement is a true sale, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreement only purports to vest Moby with a capped or fractional interest in those accounts receivable. [ECF Doc. 202, at 44].

18

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Moby, and **DENIED IN PART** as to Count II of the Complaint as against Moby.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 18, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE