**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 26-10678 |
| | § | (JOINTLY ADMINISTERED) |
| CROSBY MARINE TRANSPORTATION, LLC, | § | |
| | § | CHAPTER 11 |
| | § | COMPLEX CASE |
| DEBTORS.[1] | § | |

| | | |
|---|---|---|
| CROSBY TUGS, L.L.C., CROSBY DREDGING, LLC, CROSBY MARINE TRANSPORTATION, LLC, AND BERTUCCI CONTRACTING COMPANY, L.L.C., | § § § § | ADV. NO. 26-1018 |
| PLAINTIFFS, | § § | |
| V. | § § | |
| MEGED FUNDING GROUP A/K/A MEGED FUNDING GROUP CORP, ALLIANCE ENERGY SERVICES, LLC, ARENA OFFSHORE, CANTRELLE SERVICES LLC, CANTIUM LLC, CAJUN INDUSTRIES LLC, CHAMPAGNE ENERGY & ENVIRONMENTAL SOLUTIONS, CHEVRON PRODUCTION CO., CURTIN MARITIME, ECOSERV, LLC, ECOSERV ENVIRONMENTAL SERVICES, LLC, GAC NORTH AMERICA, INGRAM MARINE GROUP, JOHN W STONE OIL DISTRIBUTOR LLC, KENOSIS OPERATING COMPANY, KEVIN GROS CONSULTING, LOOP LLC, LUHR CROSBY LLC, MODERN AMERICAN RECYCLING, MARSHLAND EQUIPMENT RENTALS, | § § § § § § § § § § § § § § § § § § § § § § | |

---

[1]   The Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

**MCDONOUGH MARINE SERVICE,** §
**MORRISON OFFSHORE LLC,** §
**PATRIOT MARINE SERVICES,** §
**PORT OF IBERIA DISTRICT BOARD OF** §
**COMMISSIONERS,** §
**ROSE CAY MARITIME LLC,** §
**SABINE NECHES NAVIGATION DISTRICT,** §
**SPACE EXPLORATION TECHNOLOGIES,** §
**TALA ENVIRONMENTAL LLC,** §
**THOM-SEA BOAT BUILDERS,** §
**TK TOWING INC.,** §
**TPC GROUP LLC,** §
**TRITON DIVING SERVICES LLC,** §
**T&T MARINE SALVAGE INC.,** §
**VENTURE GLOBAL CALCASIEU PASS LLC,** §
**WALTER OIL & GAS,** §
**WHITE FLEET DRILLING,** §
**HEEREMA MARINE CONTRACTORS** §
**NEDERLAND, S.E.,** §
**AQUA CAPITAL LLC.,** §
**BREEZE FUNDING,** §
**CELTIC ADVANCE,** §
**EN OD CAPITAL,** §
**ALO ADVANCE,** §
**CEDAR ADVANCE LLC,** §
**CLEARFUND SOLUTIONS, LLC,** §
**COLDWATER CAPITAL, LLC,** §
**COOPER INVESTMENTS, LLC,** §
**DEPENDENCE PLATINUM,** §
**FOREVER FUNDING LLC,** §
**FREEDOM FUNDING LLC,** §
**GALT FUNDING CO,** §
**INSIGHT CAPITAL LLC,** §
**LIBERTAS FUNDING, LLC,** §
**MOBY CAPITAL LLC D/B/A MOBYCAP,** §
**MYNT GOLD, LLC A/K/A MYNT ADVANCE,** §
**NOVAC EQUITIES LLC,** §
**ODK CAPITAL, LLC D/B/A ON DECK,** §
**ORACAP LLC,** §
**OVERTIME CAPITAL,** §
**PARKVIEW ADVANCE LLC,** §
**PINNACLE BUSINESS FUNDING LLC,** §
**RELIANCE FINANCIAL FL, LLC,** §
**ROCKET CAPITAL NY, LLC.** §
**SQ ADVANCE,** §
**SURGE FUNDING LLC,** §
**TRUE BUSINESS FUNDING LLC,** §
**WEB BANK C/O LIBERTAS FUNDING LLC, &** §
**WYNWOOD CAPITAL GROUP, LLC,** §
§
    **DEFENDANTS.**

2

## MEMORANDUM OPINION AND ORDER

On April 3, 2026, shortly after commencing these jointly administered cases, Crosby Marine Transportation, LLC ("Crosby Marine"), Crosby Tugs, L.L.C. ("Crosby Tugs"), Crosby Dredging, LLC ("Crosby Dredging"), and Bertucci Contracting Company, L.L.C. as debtors and debtors-in-possession (together, the "Debtors"), commenced the above-captioned adversary proceeding by filing a complaint against certain of their Customers[2] as well as numerous MCA Defendants (the "Complaint").  [ECF Doc. 1].  Through the Complaint, the Debtors seek (i) a declaration that Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541 (Count 1); (ii) turnover of cash owed from Customers to Crosby Tugs and Crosby Dredging pursuant to accounts receivable under 11 U.S.C. § 542 (Count 2); (iii) injunctive relief enjoining the MCA Defendants from seeking payment of the Debtors' accounts receivable directly from Customers (Count 3); (iv) a declaration recharacterizing the MCA Agreements as disguised loans (Count 4); and (v) a declaration that Interested Parties are adequately protected from any diminution of the Debtors' use of cash collateral stemming from the Debtors' post-petition receivables (Count 5).  *See id*.

Before the Court is the *Debtors' Motion for Partial Summary Judgment Against MCA Defendants* (the "MPSJ"), [ECF Doc. 202].  The Debtors seek summary judgment against Celtic Advance LLC  ("Celtic") on Counts 1–4 of their Complaint.  The Debtors submitted a statement of uncontested facts, [ECF Doc. 202-1], and Celtic filed an opposition to the MPSJ, [ECF Doc. 276], and a counterstatement of material facts.  [ECF Doc. 276-2].  The Debtors filed a reply brief in support of the MPSJ.  [ECF Doc. 292].  In short:  The Debtors assert that the text of the MCA

---

[2]    Capitalized terms not otherwise defined herein are defined as described in the Complaint and exhibits attached to the Complaint.

Agreements executed among Crosby entities and Celtic is unambiguous and reveals that the agreements are disguised loans as a matter of law.  [ECF Docs. 202, 292, ¶ 5 & 292, at 33].  Celtic does not dispute that the text of the MCA Agreements is unambiguous, but asserts that analysis reveals that the agreements are by their terms true sales.  [ECF Doc. 276, ¶ 57].  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Debtors' MPSJ.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtors and their affiliates are in the marine transportation industry.  [ECF Docs. 202-47, ¶ 8 & 202-48].  The Debtors and their non-debtor affiliates have a fleet of more than 200 vessels and marine equipment, with Crosby Marine owning approximately 80% of the fleet.  [ECF Doc. 202-47, ¶¶ 23 & 28].  Crosby Tugs assists small freighters, container ships, aircraft carriers, very large crude carriers, and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semisubmersible rigs, landing platforms, and other vessels.  [ECF Doc. 202-47, ¶ 23].  Crosby Dredging deploys a variety of equipment to complete dredging work and coastal-restoration projects for a variety of governmental and private businesses.  *See* i*d.*

By providing those services to their Customers, Crosby Tugs and Crosby Dredging generate substantial accounts receivable (the "Crosby Accounts Receivable"). [ECF Doc. 202-1, ¶ 9; ECF Doc. 276]. Attached to the Complaint as Exhibit B is a schedule of uncollected past-due and owing Crosby Accounts Receivable as of the filing of the Adversary Complaint. [ECF Doc. 202-1, ¶ 10; ECF Doc. 276]. As of the date of the Complaint, Crosby Tugs had total accounts receivable in the amount of $10,840,638.45,[3] consisting of current accounts receivable in the amount of $5,755,785.29,[4] and past-due accounts receivable in the amount of $5,084,853.16,[5] while Crosby Dredging had total accounts receivable in the amount of $7,874,046.37,[6] consisting of current accounts receivable in the amount of $602,297.63,[7] and past-due accounts receivable in the amount of $7,271,748.74.[8] [ECF Doc. 202-1, ¶ 11; ECF Doc. 276].

Between February 20, 2025, and February 13, 2026, the Debtors and individual MCA Defendants executed the following prepetition MCA Agreements:

| Ex. No. | Agreement Name | MCA Counterparty | Debtor Counterparty | Date of Execution |
|---|---|---|---|---|
| 1 | *Sale of Future Receipts Agreement* | ALO Advance | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 2 | *Revenue Purchase Agreement* | Aqua Capital LLC | Crosby Tugs | 2/13/2026 |
| 3 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 12/1/2025 |
| 4 | *Sale of Future Receipts Agreement* | Breeze Funding | Crosby Dredging | 10/10/2025 |
| 5 | *Standard Merchant Cash Advance Agreement* | Cedar Advance LLC | Crosby Tugs, Crosby Dredging | 3/11/2025 |
| 6 | *Standard Merchant Cash Advance* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |

---

[3]    *See* Complaint, Ex. B, Crosby Tugs, Column G.

[4]    *See* Complaint, Ex. B, Crosby Tugs, Column D.

[5]    *See* Complaint, Ex. B, Crosby Tugs, Column F.

[6]    *See* Complaint, Ex. B, Crosby Dredging, Column G.

[7]    *See* Complaint, Ex. B, Crosby Dredging, Column D.

[8]    *See* Complaint, Ex. B, Crosby Dredging, Column F.

| | | | | |
|---|---|---|---|---|
| | *Agreement* | | | |
| 7 | *Standard Merchant Cash Advance Agreement* | Celtic Advance LLC | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 8 | *Sale of Future Receipts Agreement* | Coldwater Capital | Crosby Dredging | 5/28/2025 |
| 9 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 10 | *Revenue Purchase Agreement* | Cooper Investments LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 11 | *Sale of Future Receipts Agreement* | Dependance Platinum FL LLC | Tugs, Crosby Dredging | 5/28/2025 |
| 12 | *Standard Merchant Cash Advance Agreement* | EN OD Capital | Crosby Dredging | 6/16/2025 |
| 13 | *Standard Merchant Cash Advance Agreement* | Forever Funding LLC | Crosby Tugs | 6/30/2025 |
| 14 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 12/18/2025 |
| 15 | *Revenue Purchase Agreement* | Freedom Funding LLC | Crosby Tugs | 2/13/2026 |
| 16 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs | 11/25/2025 |
| 17 | *Revenue Purchase Agreement* | Galt Funding Co. | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 18 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 8/21/2025 |
| 19 | *Standard Merchant Cash Advance Agreement* | Insight Capital LLC | Crosby Dredging | 12/2/2025 |
| 20 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 4/22/2025 |
| 21 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Tugs, Crosby Marine | 4/22/2025 |
| 22 | *Standard Merchant Cash Advance Agreement* | Meged Funding Group | Crosby Tugs, Crosby Dredging, Crosby Marine | 5/12/2025 |
| 23 | *Agreement of Sale of Future Receipts* | Moby Capital, LLC | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 5/12/2025 |
| 24 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 25 | *Sale of Future Receipts Agreement* | Mynt Advance | Crosby Tugs, Crosby Dredging | 2/13/2026 |
| 26 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/18/2025 |
| 27 | *Revenue Purchase Agreement* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |

| 28 | *Revenue Purchase Agreement ($100,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
|---|---|---|---|---|
| 29 | *Revenue Purchase Agreement ($200,000.00 Purchase Price)* | Novac Equities LLC | Crosby Tugs, Crosby Dredging | 1/22/2026 |
| 30 | *Business Loan and Security Agreement* | OnDeck | ODK Capital LLC | Crosby Dredging | Undated |
| 31 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 4/10/2025 |
| 32 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 7/11/2025 |
| 33 | *Agreement of Sale of Future Receipts* | Orcacap, LLC | Crosby Dredging | 9/5/2025 |
| 34 | *Sale of Future Receipts Agreement* | Overtime Capital | Crosby Dredging | 6/24/2025 |
| 35 | *Standard Merchant Cash Advance Agreement* | Parkview Advance | Crosby Tugs | 11/12/2025 |
| 36 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 11/12/2025 |
| 37 | *Standard Merchant Cash Advance Agreement* | Pinnacle Business Funding LLC | Crosby Tugs, Crosby Dredging | 12/26/2025 |
| 38 | *Sale of Future Receipts Agreement* | Reliance Financial FL LLC | Crosby Tugs, Crosby Dredging | 12/9/2025 |
| 39 | *Agreement for the Purchase and Sale of Future Receipts* | Rocket Capital NY LLC | Crosby Dredging | 4/25/2025 |
| 40 | *Merchant Cash Advance* | SQ Advance | Crosby Tugs, Crosby Dredging, Crosby Marine, Bertucci | 6/11/2025 |
| 41 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 11/25/2025 |
| 42 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 12/26/2025 |
| 43 | *Revenue Purchase Agreement* | Surge Funding LLC | Crosby Tugs | 1/22/2026 |
| 44 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 2/20/2025 |
| 45 | *Standard Merchant Cash Advance Agreement* | Wynwood Capital Group | Crosby Dredging | 3/11/2025 |

[ECF Doc. 202-1, ¶ 24 & 202-2 to -46; ECF Doc. 276].   The Debtors and Celtic do not dispute that on December 18, 2025, and on February 13, 2026, they entered into the agreements attached as Exhibits 6 and 7 to the Debtors' MPSJ and that those agreements are true and correct copies. [ECF Docs. 202-7 & 202-8; ECF Doc. 202-1, ¶ 24; ECF Doc. 276].   The basic terms of the agreements are:

- On December 18, 2025, Kurt J. Crosby, on behalf of Crosby Tugs and individually as Guarantor, entered into a "Standard Merchant Cash Advance Agreement"/"Future Receivables Sale and Purchase Agreement" with Celtic for the "purchase" by Celtic of the Debtor's "Future Receipts" in the amount of $262,500.00, for a "Purchase Price" of $175,000.00 (the "First Celtic MCA Agreement"). [ECF Doc. 202-7, at 1–2 & 19].

- On February 13, 2026, Kurt J. Crosby, on behalf of Crosby Tugs and individually as Guarantor, entered into a "Standard Merchant Cash Advance Agreement"/"Future Receivables Sale and Purchase Agreement" with Celtic for the "purchase" by Celtic of the Debtor's "Future Receipts" in the amount of $825,000.00 for and "in consideration of a "Purchase Price" of $550,000.00 (the "Second Celtic MCA Agreement" and, with the First Celtic MCA Agreement, the "Celtic MCA Agreements"). [ECF Doc. 202-8, at 1–2 & 19]. [9]

## DISCUSSION

### A.  Summary Judgment Standard

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times.  *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The

---

[9]  The remaining terms of the Celtic MCA Agreements are identical.  Thus, any references herein to the operative terms of the First Celtic MCA Agreement include identical provisions contained within the Second Celtic MCA Agreement.

interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

B.      **Standards for Determining Whether a Purported Sale of Receivables Is a True Sale or a Disguised Loan**

Bankruptcy Courts have been tasked with classifying merchant cash advance agreements as either true sales or disguised loans in a variety of contexts. *See, e.g.*, *Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026) (classifying MCA agreements in evaluating application of state usury law); *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274, 2019 WL 342577, at *3 (Bankr. E.D.N.C. Jan. 25, 2019) (classifying MCA agreements in evaluating application of avoidance actions under 11 U.S.C. § 547 & 548); *see also generally* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 BANKR. L. LETT. 4 (2022). The parties here ask this Court to determine whether the Celtic MCA Agreements are true sales as

9

identified on the face of the agreements, or whether the Court should recharacterize the purported sales as disguised loans based on the substance of the agreements for purposes of determining whether the Crosby Accounts Receivable are property of the estate under 11 U.S.C. § 541(a).

Property of the estate consists of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). The parties executed the Celtic MCA Agreements prepetition. If the Celtic MCA Agreements are true sales of certain of the Crosby Accounts Receivable, then the Debtors transferred their interests in those receivables prepetition and did not have a "legal or equitable" interest in them as of the commencement of the case. In that case, those receivables are not property of the estate. If the Celtic MCA Agreements are disguised loans, however, the Debtors retained their interests in the receivables, making them property of the estate under § 541(a)(1) of the Bankruptcy Code.

Generally, bankruptcy courts look to state law to determine the extent of a party's interest in property. *See Butner v. United States*, 440 U.S. 48, 54–55 (1979). The parties do not dispute that their respective interests in certain of the Crosby Accounts Receivable under the Celtic MCA Agreements are governed by New York law pursuant to a choice-of-law provision in the contract. [ECF Docs. 202 & 276]. New York's general rule of contract interpretation is that "agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (internal quotations and citation omitted). Indeed, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

When determining whether a contract evidences a sale or a loan, New York law requires courts look to substance over form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls." (citation omitted)); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, No. 25-3004, 2025 WL 1934205, at *5 (Bankr. N.D. Ohio July 14, 2025) (under New York law, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether the economic risk of ownership truly transferred to the purported buyer" (citing cases)).[10] Courts applying New York law have identified various non-exclusive hallmarks to evaluate whether a purported sale of receivables is, in substance, a loan. In the context of evaluating a transaction

---

[10] It is true that the plain language of the Celtic MCA Agreements describes the transactions as "sales":

- On page 2, the agreements are labeled as "Future Receivables Sale and Purchase Agreement[s]." [ECF Docs. 202-7, at 2].

- Paragraph III of the Celtic MCA Agreements entitled "Sale of Purchased Future Receipts" states: "Seller hereby irrevocably assigns, transfers and conveys onto Purchaser all of the Seller's right, title and interest in the Specified Percentage of the Future Receipts . . . . By virtue of this Agreement, Seller transfers to Purchaser full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein." [ECF Docs. 202-7, ¶ III].

- Paragraph XIII of the Celtic MCA Agreements entitled "Risk Sharing Acknowledgments and Arrangements" states, in part: "This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by the Seller from Purchaser." [ECF Docs. 202-7, ¶ III(b)].

- Paragraph XIII of the Celtic MCA Agreements entitled "Risk Sharing Acknowledgments and Arrangements" also states, in part: "The Parties agree that the Purchase Price is paid to the Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by the Purchaser is not intended to be, nor shall it be construed as a loan from the Purchaser to the Seller that requires absolute and unconditional repayment on a specified maturity date." [ECF Docs. 202-7, ¶ III(k)].

But this Court is not bound by the language in the Celtic MCA Agreements labeling the transaction as a sale because under New York law, the characterization of a transaction as a true sale or a disguised loan turns on the substance of the transaction rather than its form. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

under usury law, one court found that "[u]nless a principal sum advanced is repayable absolutely, the transaction is not a loan" and weighed three factors to determine whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (N.Y. App. Div. 2d Dept. 2020) (citing cases). But those "three factors provide only a guide to analysis." *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022). "They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Id*. (citations omitted). Similarly, to determine property of a debtor's estate under § 541, another court weighed eight other characteristics to decide whether a purported sale of receivables is actually a loan:

(1)    Language of the documents and conduct of the parties;

(2)    Recourse to the seller;

(3)    Seller's retention of servicing and commingling of proceeds;

(4)    Purchaser's failure to investigate the credit of the account debtor;

(5)    Seller's right to excess collections;

(6)    Purchaser's right to alter pricing terms;

(7)    Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8)    Seller's retention of right to repurchase assets.

*In re R&J Pizza Corp.*, No. 14-43066, 2014 WL 12973408, at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 186–94 (1991)); *see also Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr.

D. Mont. 2021) (weighing those hallmarks to determine whether a transaction was a true sale or disguised loan under usury law and to resolve an avoidance action).

But courts have increasingly backed away from the mechanical application of any one set of factors in favor of a flexible, totality-of-the-circumstances approach. As explained by Judge Wiles:

> [I]t ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan. In deciding what the substance of [a] transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale. A court that does not do so has only examined half of the relevant question.

*Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473, 500 (Bankr. S.D.N.Y. 2026). "That said, a consideration that overlays and unites the factors is how the parties allocated *risk*." *In re Shoot the Moon, LLC*, 635 B.R. at 813. "A sale typically occurs when the risk of loss from the purchased assets passes to the buyer—a gamble usually reflected in the purchase price." *Id*. at 813–14. "Conversely, in a disguised loan, the parties may employ various methods to allocate risk—the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id*. at 814.

Thus, the root of the true-sale-versus-disguised-loan analysis is the transfer of risk. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). But it is also important to distinguish the type of risk that is indicative of a true sale from the ordinary credit risks that are borne by any lender. That the purported buyer is not guaranteed full repayment under all conceivable circumstances is not sufficient to characterize a transaction as a true sale because all loans come with at least some degree of risk that the lender will not receive the benefit of the bargain. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 499 ("The risk that

13

a borrower might die or become insolvent, for example, is a risk that every lender takes . . . .").

The relevant question is: Who is exposed to the *direct* risk of non-payment of the receivables?

> "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a <u>bona fide</u> purchase of receivables and the transaction is, in substance, a loan.

*Haymount Urgent Care PC*, 609 F. Supp. 3d at 247 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F. 3d 1063, 1069 (2d Cir. 1995)). Indeed, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders . . . ." *Adar Bays, LLC,* 179 N.E.3d at 622 (citations omitted).

### C. Under New York Law, the Celtic MCA Agreements Are Disguised Loans.

#### 1. The Debtors overwhelmingly bear the direct risk of non-payment of the Crosby Accounts Receivables.

Several provisions in the Celtic MCA Agreements work together effectively to shield Celtic from all risk that the purchased receivables may be uncollectible, placing that risk squarely upon the Debtors. Under the Celtic MCA Agreements, Celtic purportedly purchased "Future Receipts" generically identified as "all of the Seller's receipts of monies for the sale of its goods and services after the Effective Date of this Agreement." [ECF Doc. 202-7, ¶ I(f)]. Because the Celtic MCA Agreements identify no particular revenue source, Celtic bore no actual risk of non-payment from any specific customer of the Debtors. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (finding that non-specific receivables showed that purported risks of a buyer did not actually exist). Indeed, the fact that no specific receivables are identified in the Celtic MCA Agreements bears strongly on the question of risk because the

Debtors' obligation to repay the purchase price is independent of the collectability of any particular receivable. Thus, the failure to collect on any particular account never affects the amount Celtic is entitled to recover under the Celtic MCA Agreements, so the direct risk of non-collectability remains with the Debtors.

Further, although ostensibly a sale of "Future Receipts," Celtic's collateral securing performance is substantially broader than the receivables purchased. The Celtic MCA Agreements provide:

> As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of the Seller pursuant to this Agreement (collectively, the "Obligations"), the Seller hereby pledges, assigns and hypothecates to the Purchaser (the "Pledge") and grants to the Purchaser a continuing, perfected and first priority lien upon and security interest in all of the Seller's rights, titles and interest in **all accounts, including, but not limited to: deposit accounts, accounts receivables, other receivables, chattel paper, documents, equipment, general intangibles, instruments and inventory (collectively, the "Collateral"), whether now existing or hereinafter acquired**.

[ECF Doc. 202-7, ¶ XVIII(a) (emphasis added)]. "The fact that the documents contemplate a broad security package for [Celtic] to generally collateralize payment obligations is indicative of a loan, not a sale." *In re Shoot the Moon, LLC*, 635 B.R. at 815.

The Celtic MCA Agreements also give Celtic rights and recourse against property in addition to its collateral. Indeed, the Celtic MCA Agreements give Celtic direct access, control, and authority to sweep funds from the Debtors' bank account:

- **During the term of this Agreement, the Seller shall: (i) deposit all Future Receipts into one (and only one) bank account, which shall be preapproved by the Purchaser (the "Approved Bank Account"); (ii) use one (and only one) credit card processor, which shall be preapproved by the Purchaser (the "Approved Processor"); and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease to operate during the term of this Agreement, Seller shall arrange for another Approved Bank**

15

**Account or Approved Processor within twenty-four (24) hours**. [ECF 202-7, ¶ VII (emphasis added)].

- **The Seller hereby authorizes the Purchaser to initiate electronic payments or ACH debits from the Approved Bank Account in the amount of the Scheduled Remittance on each Business Day commencing on the Effective Date until the Purchaser receives the full Purchased Amount. The Parties agree that the Seller shall provide Purchaser with all access code(s) for the Approved Bank Account.** [ECF Doc. 202-7, ¶ VIII (emphasis added)].[11]

The Celtic MCA Agreements also include a personal guarantee executed by Kurt J. Crosby, guaranteeing "prompt, full, faithful and complete performance and observance of all of Seller's Obligations under the Agreement." [ECF Docs. 202-7, 18, at ¶ 1]. And upon the occurrence of an event of default,[12] Celtic can choose from a host of aggressive remedial provisions, including but not limited to those found in the section labeled "Remedies" in the Celtic MCA Agreements:

Upon the Seller's default, the **Purchaser may immediately proceed to protect and enforce its rights under this Agreement** by:

---

[11] The Celtic MCA Agreements further required the Seller to

**execute an agreement with the Purchaser that shall authorize the Purchaser to arrange for electric fund transfers and/or ACH Payments of the Scheduled Remittances or Adjusted Scheduled Remittance from the Approved Bank Account. The Seller shall provide the Purchaser and/or its authorized agent with all the information, authorizations and passwords necessary to verify the Seller's receivables, receipts and deposits in the Approved Bank Account. The Seller shall authorize the Purchaser and/or its agent to deduct the payments to Purchaser. The authorization shall be irrevocable until such time when the Seller shall has satisfied its obligations under this Agreement.**

[ECF Doc. 202-7, ¶ XX(a) (emphasis added)].

[12] Under the Celtic MCA Agreements, an "Event of Default" occurs when:

i. The Seller shall violate any term, condition or covenant in this Agreement governing the Seller's obligations of timely delivery of the Scheduled Remittances or Adjusted Scheduled Remittance to the Purchaser;

ii. The Seller shall violate any term, condition, or covenant in this Agreement in regard to any other sums due for any reason whatsoever other than as the result of the Seller's business ceasing its operations exclusively due to any of the Valid Excuses;

iii. Seller knowingly or willfully provides incorrect, false or misleading information to the Purchaser at any time;

iv. The Seller shall violate any term, condition or covenant in this Agreement;

16

i.    Enforcing its rights as a creditor, including, but not limited to, notifying any account debtor(s) of the Seller's of the Purchaser's security interest;

ii.    **Enforcing the provisions of the Personal Guarantee of Performance** against the Guarantor(s) without first seeking recourse from the Seller for the full balance owed at the time of default, plus applicable fees and costs;

iii.    **Notifying the Seller's credit card processor of this Agreement and to direct such credit card processor to make payments directly to the Purchaser of any** and all amounts received by said credit card processor on behalf of the Seller;

iv.    Commencing a law suit, whether for specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of the Seller's obligations hereunder, or any other legal or equitable right or remedy;

v.    In case any Event of Default occurs and it is not waived, the Purchaser will be entitled to the issuance of an injunction, restraining order, or any other equitable relief in Purchaser's favor, subject to court approval, restraining the Seller's accounts and/or receivables up to the amount due to the Purchaser as a result of the Event of Default and the **Seller will be deemed to have consented to the granting of an application for the same to any court of competent jurisdiction without any prior notice to the Sellers and without the Purchaser being required to furnish a bond or other undertaking in connection with the application**;

---

v.    The Seller uses multiple depository accounts without obtaining prior written consent of the Purchaser;

vi.    The Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

vii.    The Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of the Purchaser;

viii.    The Seller interferes with the Purchaser's collection of the Scheduled Remittance or Adjusted Scheduled Remittance, including, but not limited to the Seller interfering with ACH Payments;

ix.    Two (2) or more ACH transactions attempted by the Purchaser are rejected by the Seller's Bank;

x.    The Seller takes on additional financing (known as "Stacking") at any times after the Effective Date and prior to the final payment pursuant to this Agreement; or

xi.    The Guaranty shall for any reason cease to be in full force and effect.

[ECF Doc. 202-7, ¶ IX(a)].

vi. In case the Guarantor's obligations become due hereunder and are not waived, the Purchaser will be entitled to the issuance of an injunction, restraining order, or other equitable relief in the Purchaser's favor, subject to court approval, restraining the Seller and Guarantor's accounts and/or receivables up to the amount due to the Purchaser as a result of the Event of Default, and the Seller and Guarantor, each, in their individual capacities, will be deemed to have consented to the granting of an application for the same to any court of competent jurisdiction, without any prior notice to the Seller or Guarantor and without the Purchaser being required to furnish a bond or other undertaking in connection with the application.

[ECF Doc. 202-7, ¶ XIX(c) (emphasis added)].

A Debtor under the Celtic MCA Agreements could fail to fund one sweep of its account—constituting an event of default, *see supra* note 12—and find itself subject to immediate acceleration of the full amount of the transaction outstanding **without notice**.[13]  Under the Celtic MCA Agreements, Celtic can act as the Debtors' attorney-in-fact

to take any action or execute any instrument or document:  (i) to settle all obligations due to the Purchaser from any credit card processor and/or account debtor(s) of the Seller; (ii) upon occurrence of an Event of Default, to perform any and all obligations of the Seller under this Agreement to protect the value of the Collateral by obtaining the required insurance; (iii) to collect monies due or to become due under or in respect of any of the Collateral; (iv) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with this Agreement; (v) to sign the Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors (collectively, "Account Debtors") to make payment directly to the Purchaser; and (vi) to file any claims or take any action or institute any proceeding which the Purchaser may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise enforce its rights with respect to the collection of the Purchased Amount.

[ECF Doc 202-7, ¶ XIX(d)].  And if Celtic is unable to recover its outstanding balance from the Debtors' bank account, Celtic is entitled to chase full repayment from Kurt Crosby as guarantor of the debt without first seeking recourse from the "Seller."  Read in tandem, the provisions of the

---

[13]    [ECF Doc. 202-7, ¶ XIX(b) ("Upon occurrence of an Event of Default due to the Seller's breach of its obligations under this Agreement, the Seller shall immediately deliver to the Purchaser the entire unpaid portion of the Purchased Amount.")].

18

Celtic MCA Agreements make it obvious that Celtic bore zero risk of a revenue shortfall in the Debtors' receivables; rather, the provisions are structured to ensure the Debtors' absolute payment obligation. "The repayment and remedy terms of the MCA agreements . . . operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Haymount Urgent Care PC*, 609 F. Supp.3d at 249.

The features of the Celtic MCA Agreements weigh in favor of finding the transactions to be disguised loans. *See In re Greenwich Retail Grp. LLC*, 677 B.R. at 503–04; *id*. at 248–50. In sum:

> Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans. As a whole, they provide [Celtic] with at least conditional recourse and expanded legal rights against [the Debtor] entities and the personal guarantors. Plus, they allocate great risk to the [Debtor] counterparty while protecting [Celtic] with much more than just the receivables. [Celtic's] panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

*In re Shoot the Moon*, 635 B.R. at 817.

> 2. *On balance, other hallmarks of the Celtic MCA Agreements weigh in favor of the Court's conclusion that the agreements are disguised loans.*

At first glance, the Celtic MCA Agreements appear to contain an indefinite term because it requires the Debtors to continue to pay regular, installment amounts until they have fully paid the sum of "receivables" purportedly purchased and specifically states that "[t]his Agreement does not have a fixed duration and shall expire upon the date when the Purchased Amount and all other sums due to the Purchaser are paid in full ("Expiration Date")." [ECF Doc. 202-7, 1 & ¶ II]. And, a contract with an indefinite term is suggestive of a true sale. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collected." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022)

(citing *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)). But the Celtic MCA Agreements have a de facto fixed term that can be calculated by dividing the amount that the Debtors owe by the amount of daily payments. As discussed above, a failure to fund Celtic's sweeps of the Debtors' account will not serve to indefinitely extend the term—it will only result in an event of default and accelerate the term without notice. And as also made clear above, Celtic assumes no risk for uncollected receivables. Thus, this factor weighs in favor of the Court finding the Celtic MCA Agreements to be disguised loans.

Finally, Paragraph X(a) of the Celtic MCA Agreements entitled "Reconciliation" allows the Debtors to request Celtic to perform a reconciliation for purposes of modifying the amount of the daily "Scheduled Remittance." [ECF Doc. 202-7, ¶ X(a) ("If at any time during the term of this Agreement Seller shall experience unforeseen decreases to their Daily Receipts, Seller shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.")]. "Such a modification to their Scheduled Remittance (the "Reconciliation") shall be performed by Purchaser within five (5) Business Days following the written request by Seller for said Reconciliation." *Id.* Under the Celtic MCA Agreements, the Debtors may seek reconciliation an unlimited number of times. [ECF Doc. 202-7, ¶ X(c)].

Regardless of the outcome—as determined by Celtic—the amounts owed by the Debtors under the Celtic MCA Agreements are never reduced due to unforeseen adverse business developments outside the Debtors' control. Reconciliation may delay repayment (or accelerate it if Celtic finds that the Debtors' records are incorrect) but the reconciliation process does nothing to shift the risk of uncollectible receivables.[14] For that reason, the Court finds

---

[14] Arguably, the reconciliation process here is illusory; as discussed above, elsewhere in the Celtic MCA Agreements, the failure to fund one sweep results in an irremediable infraction that would foreclose

that this particular reconciliation provision weighs in favor of a finding that the Celtic MCA Agreements are not true sales, but rather disguised loans.

## CONCLUSION

The Court thus concludes that the unambiguous terms of the Celtic MCA Agreements substantively reveal the Debtors' complete exposure to the direct risk of non-payment of Crosby Accounts Receivables, making those agreements disguised loans under New York law.  The Court grants judgment as a matter of law in favor of the Debtors and against Celtic as to Counts I, III, and IV of the Complaint.[15]  Accordingly,

**IT IS ORDERED** that the Debtors' MPSJ is **GRANTED IN PART** as to Counts I, III, and IV of the Complaint as against Celtic, and **DENIED IN PART** as to Count II of the Complaint as against Celtic.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, June 18, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

any possibility of future reconciliation.  Upon such an event of default, Celtic may employ any or all of the "Remedies" made available to it to ensure repayment under the Celtic MCA Agreement is accomplished. *See supra* pages 16–18.

[15]     The Debtors' MPSJ seeks summary judgment on Counts I through IV of the Complaint "as against those MCA Defendants identified in the Adversary Complaint," [ECF Doc. 202], but Count II seeks relief solely against the Defendants identified as "Customers" of the Debtors.

Because the Court finds the Celtic MCA Agreements to be disguised loans, it need not address the Debtors' alternative argument that, even if the Celtic MCA Agreements are true sales, the Debtors retain residual and reversionary interests in the Crosby Accounts Receivable because the agreements only purport to vest Celtic with a capped or fractional interest in those accounts receivable.  [ECF Doc. 202, at 44].